779 A.2d 463 (2001)
343 N.J. Super. 589
Washington McLELLAND, Plaintiff-Appellant/Cross-Respondent,
v.
Robert A. MOORE, Peter Yuro, Larry Pollex, Joseph Vas, and the Perth Amboy Police Department, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 17, 2001.
Decided September 4, 2001.
*465 Eldridge Hawkins, East Orange, argued the cause for appellant/cross-respondent (Herbert J. Tan, on the brief).
Fredrick L. Rubenstein, Perth Amboy, argued the cause for respondents/cross-appellants (Nolan & Hynes, attorneys; Mr. Rubenstein, on the brief).
Before Judges PRESSLER, KESTIN and CIANCIA.
*464 The opinion of the court was delivered by KESTIN, J.A.D.
Plaintiff, a member of the Perth Amboy Police Department, sued for damages alleging, among other grounds, violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. The defendants were the Police Department, the two individuals who served as Deputy Chief of Police during the time period alleged, and the Mayor and Business Administrator of the municipality. The CEPA allegations bore upon the individual parties' conduct regarding a series of events, including the handling of two gun permit applications.
During an initial trial, the trial court dismissed all but the CEPA count. As to that cause of action, the jury returned a verdict in plaintiff's favor, awarding him $5,600 for past financial loss and $72,800 for future financial loss, but nothing on his claim of damages for emotional distress. The jury also awarded $700,000 in punitive damages. The trial court then, sua sponte, dismissed the claims against the individual defendants on the basis that "[t]his was strictly a claim against the employer[.]"
Shortly after the verdict was rendered, the trial court, inter alia, denied a reserved aspect of a motion defendants had made at the close of plaintiff's case for dismissal of the CEPA claim on res judicata grounds. The premise of the motion was that the factual bases for the CEPA claim had previously been adjudicated unfavorably to plaintiff in an employment disciplinary proceeding.[*]
Several weeks later, on defendants' motion for judgment notwithstanding the verdict or a new trial, the court granted a new trial on liability for punitive damages but denied judgment n.o.v. or a new trial on liability for compensatory damages. It *466 also denied another motion by defendants to dismiss the complaint on res judicata grounds, denied plaintiff's motion to reconsider the dismissal of the CEPA claim against defendant Peter Yuro, denied plaintiff's motion for prejudgment interest, and reserved on plaintiff's claim for attorneys' fees until the punitive damages retrial.
Subsequently, the trial court denied plaintiff's motion for reconsideration of its decision to grant defendants a new trial on punitive damages. It also denied defendants' motion to reconsider the denial of their motion to treat the findings in the prior employment discipline proceeding as preclusive of plaintiff's CEPA claim. Finally, on its own motion, the court set aside the compensatory damages verdict on the ground that the jury had reduced the damages by 30% in the mistaken belief that plaintiff would not be taxed on the award. The order memorializing these rulings specified that the issues for retrial were the amount of past and future compensatory damages on plaintiff's CEPA claim, defendants' liability for punitive damages, and the amount of punitive damages.
In the limited retrial, after the close of evidence on compensatory damages, the jury awarded plaintiff $200,000 for emotional distress, $5,000 for past loss of the opportunity to perform off-duty work, zero for future loss of such work, $31,500 for "all other past economic loss," and $200,000 for "all other future economic loss."
At the close of evidence on punitive damages, defendants moved to dismiss that claim. The court reserved decision on the motion. The jury found defendants liable for punitive damages of $600,000.
Shortly after the retrial, plaintiff moved for enhanced counsel fees based on the success of his CEPA claim. Counsel certified total fees of $58,100 and costs of $673.60. Defendants opposed the motion. Plaintiff also moved for prejudgment interest on his CEPA claim, which defendants opposed as well.
The trial court entered an order of judgment for plaintiff against the Police Department only. The order set compensatory damages at $436,000, punitive damages at $600,000, denied prejudgment interest, and was silent as to counsel fees.
Defendants then moved for judgment notwithstanding the verdict or, in the alternative, for a new trial on both compensatory and punitive damages. In addition to opposing defendants' motion on the merits, plaintiff also argued that the motion for judgment notwithstanding the verdict or for a new trial was untimely under the twenty-day limitation period of R. 4:40-2(b) and R. 4:49-1(b).
On April 20, 1999, the trial court ruled that defendants' motion was timely because the earlier motion for judgment at the close of evidence had been timely and the absence of a ruling on it was due to the court's oversight, and that the pendency of the counsel fee issue kept the judgment from being final for any purpose. The court ordered a new trial on compensatory damages for "emotional distress" if plaintiff did not accept remittitur of that award from $200,000 to $50,000. The court also granted defendants' motion for judgment notwithstanding the verdict regarding punitive damages on the ground that none of the facts established could "serve as a basis for a punitive award[.]"
The parties entered into a consent order setting plaintiff's award for counsel fees and costs at $57,773.60. According to the terms of the order, plaintiff's attorney waived his right to an enhanced fee, and payment of the fee awarded was contingent on the outcome of this appeal.
*467 On May 11, 1999, the trial court entered an order granting defendants' motion for judgment notwithstanding the verdict on punitive damages, granting "defendants' application" for remittitur of the compensatory damages for emotional distress to $50,000, modifying an earlier order to set $286,500 as the figure for "the total judgment[,]" and awarding plaintiff counsel fees and costs of $57,773.60 pursuant to the consent order.
In the meantime, on April 22, 1999, plaintiff had filed his notice of appeal, seeking review of the July 13, 1998 order that had granted defendants a new trial on compensatory and punitive damages, and of the March 5, 1999 order denying prejudgment interest.
The issues as framed in plaintiff's brief on appeal, however, go further:
POINT I THE SECOND LOWER COURT'S APRIL 20, 1999 DECISION WAS VOID AB INITIO BECAUSE THE MOTIONS FOR A NEW TRIAL AND/OR JUDGMENT NOT WITHSTANDING THE VERDICT WERE NOT TIMELY FILED.
POINT II IN THE ALTERNATIVE, THE MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT SHOULD APPLY ONLY TO PUNITIVE DAMAGES AND NOT THE COMPENSATORY DAMAGES.
POINT III THE SECOND LOWER COURT'S GRANTING OF THE J.N.O.V. MOTION IN THE DAMAGES TRIAL WAS PLAIN AND/OR REVERSIBLE ERROR.
POINT IV THE FIRST LOWER COURT'S RELEASE OF INDIVIDUAL DEFENDANTS AND DISMISSAL OF ALL CAUSES OF ACTIONS WITH THE EXCEPTION OF CEPA IN THE LIABILITY PORTION OF THE TRIAL WAS PLAIN AND/OR REVERSIBLE ERROR.
POINT V THE FIRST LOWER COURT ERRED IN FINDING THAT THE CASE WAS SUBJECT TO THE NEW PUNITIVE DAMAGES LAW AND THE REMOVAL OF THE ORIGINAL PUNITIVE DAMAGE AWARD WAS PLAIN AND/OR REVERSIBLE ERROR.
POINT VI THE LOWER COURT ERRED IN NOT GRANTING PLAINTIFF PRE-JUDGMENT INTEREST ON THE CEPA AWARD.
POINT VII PLAINTIFF'S COUNSEL IS ENTITLED TO FURTHER ATTORNEYS FEES FOR THE PROSECUTION OF THIS APPEAL.
On May 28, 1999, plaintiff moved in the Appellate Division for a ruling that the May 11, 1999 order was "void" due to defendants' untimeliness in moving for judgment notwithstanding the verdict.
On June 11, 1999, defendants moved for leave to file their notice of cross-appeal nunc pro tunc from the trial court's July 13, 1998 order denying defendants' motion to dismiss the complaint on res judicata grounds; denying defendants' motion for judgment notwithstanding the verdict as to the issue of liability; and denying defendants' motion for a new trial as to the issue of liability. Defendants' appeal also encompasses a challenge to the May 11, 1999 order applying remittitur in respect of the award of damages for emotional distress in lieu of granting defendants' motion for judgment notwithstanding the verdict as to that issue.
We granted defendants' motion for leave. We also reserved decision on plaintiff's invalidation motion pending consideration of the merits of the appeal.
*468 Plaintiff's proofs at the first trial, like the allegations of his complaint, were a litany of disaffection with the Police Department and disappointment with the way in which he had been treated over the years by his superiors and officials of the municipality. Many of the incidents plaintiff complained of predated the specific events on which he bases his CEPA claim. We are in substantial agreement with the reasons the trial judge articulated for dismissing the non-CEPA claims and with his determination to limit the CEPA claim to two incidents involving gun permit applications. We are also in substantial agreement with the reasons articulated by the trial judge in his ruling regarding the timeliness of defendants' motion for judgment notwithstanding the verdict or for a new trial. The initial question remaining, therefore, is whether either of the gun permit incidents described qualified as the type of conduct protected by CEPA and whether plaintiff had made an adequate showing of CEPA violations sufficient to support a jury verdict on that basis.
The factual allegations of the amended complaint, which we set forth here exactly as presented, state the following as giving rise to all of plaintiff's claims:
a) September, 1990 Mayor Vas wanted his father in law to obtain a permit to carry a firearm to work the security detail at Mendez Dairy. A principal of the security company, Edwardo Trijullio was a big supporter of defendant Vas.
b) Plaintiff complained about missing gasoline sheets on December 19, 1990. plaintiff received a memo from Deputy Chief Moore objecting to plaintiffs overtime request and requiring plaintiff to submit leave of absence request in future.
c) February 13, 1991, plaintiff division was reorganized and plaintiff's office placed in basement in a room used as a lounge. Plaintiff questioned Deputy Chief Moore why Moore gave a councilman his gun permits personally and did not collect the $7.00 fee. Deputy Chief Moore thereafter handed plaintiff seven one dollar bills.
d) June, July 1991, plaintiff was physically trying to arrest a person who was Vas' committeeman and supporter. Vas tried to interfere with arrest and tried to talk plaintiff out of it. Plaintiff received a reprimand from Chief Poloka.
e) In January, 1992 plaintiff was moved to a smaller office in E.M.
f) On March 10, 1992 plaintiff was ordered by Dep. Chief Moore out of his office to Uniform Division Patrol night shift, 5:00 PM-3:00 am. No 4 day warning was given as per contract.
g) On September 18, 1992, defendant Moore left Lt. Hohal in charge over plaintiff, the senior captain, contrary to general procedures.
h) August 28, 1992, plaintiff carry-over vacation time was denied to him.
i) November 4, 1992 plaintiff was not given seniority status to which he was entitled when plaintiff was placed back in uniform and defendant Yuro was left on days.
j) September 26, 1993 defendant Moore again stripped plaintiff of his duties.
k) November, 1993 Deputy Chief Moore engaged in discriminatory vacation requests submissions.
l) On or about March 29, 1994 plaintiff complained about certain inappropriate bidding procedures and was retaliated against.
m) In 1994-1995, Deputy Chief Moore engaged in inappropriate firearm permit interference by discriminatorily *469 changing rules for his own purposes. Plaintiff objected and was retaliated against.
n) In 1994-1995, Deputy Chief Moore inappropriately give out assignments and time off. Plaintiff was to receive telecommunications assignment which was given to Lt. Prozacky. Plaintiff complained and was retaliated against.
o) Deputy Chief Yuro gave the court clerk a special parking space in the street. When plaintiff suggested this is unlawful, plaintiff was further retaliated against.
p) April, 1995 plaintiff was harassed by Defendant Yuro in various ways.
q) In October 1995, plaintiff was in disagreement with Deputy Chief Yoro about the legality to two incidents; issuance of a gun permit and rewriting of an MVA report. False charges were brought against plaintiff, in retaliation. A disciplinary hearing was held in April 1996, and plaintiff was suspended and demoted.

[Sic.]
In his testimony at trial, plaintiff recounted details concerning these allegations and offered some testimony regarding other instances of on-the-job mistreatment. The testimony of five other witnesses was presented to provide corroborating detail as to some of plaintiff's allegations. Plaintiff's testimony began with his personal background, a statement of his belief that he had been passed over for promotion to deputy chief in favor of someone less qualified, and a recitation of incidents in which his treatment by superiors ignored his seniority status in the Department. He recounted in some detail a history of poor and deteriorating relationships with supervisory personnel.
It is beyond question that most of the ill treatment plaintiff alleged was of his own making. We noted in affirming the Merit System Board in the related disciplinary proceeding that substantial evidence supported both the determination that plaintiff's "explanations for his conduct were not credible" and the finding that he had
conducted himself in an insubordinate manner by use of disrespectful, insolent, abusive and threatening language toward a superior officer; neglected, failed, or refused to perform his duty to submit responsive reports in compliance with the lawful orders of his deputy chief; and conducted himself in a manner subversive of the good order and discipline of the department.

[In re Washington McLelland, supra, at 3.]
We added:
The record before the [administrative law] judge and the Board clearly demonstrated that appellant neglected and failed to perform his duty, was insubordinate and disrespectful to a superior officer and conducted himself in a manner subversive of order and discipline in the police department. The discipline imposed was fully warranted.

[Ibid.]
There may have been some appearance of a concern on plaintiff's part with illegality or policy violations in respect of several of the allegations he made. Nevertheless, it is clear as a matter of law, based upon the entire record before us in this civil action and in the related administrative proceeding, that the conduct of which plaintiff complains on the part of department and municipal officials does not qualify as CEPA-type retaliation. Plaintiff's insubordinate acts and his frequent and emphatic expressions of disagreement with the decisions and conduct of his superiors require a contrary conclusion. Such action *470 as was taken against him was in the context of a routine disciplinary proceeding clearly based upon the totality of plaintiff's conduct and the poor relationships his actions, words, and attitudes had engendered.
CEPA protects employees from retaliation for specified attempts to report what the employee reasonably perceives as misconduct:
An employer shall not take any retaliatory action against an employee because the employee does any of the following:
a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law....
* * *
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law...;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]
The Court in Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193, 707 A.2d 1000 (1998), emphasized that the employee must have an "objectively reasonable belief" in the occurrence of such improper conduct, rather than an objection based on some other principle, no matter how deeply believed:
In our view, the sensible meaning of CEPA is that the objecting employee must have an objectively reasonable belief, at the time of objection or refusal to participate in the employer's offensive activity, that such activity is either illegal, fraudulent or harmful to the public health, safety or welfare, and that there is a substantial likelihood that the questioned activity is incompatible with a constitutional, statutory or regulatory provision, code of ethics, or other recognized source of public policy.
The court also observed that the employee is not required to have "[s]pecific knowledge of the precise source of public policy." Ibid. It is enough that a court will be able to identify the law or public policy that might have been violated by the challenged conduct. See id. at 193-96, 707 A.2d 1000 (interpreting CEPA to protect employee who challenged company's order to perform tasks in another nation that would violate a "law, rule or regulation" of that nation); accord Abbamont v. Piscataway Twp. Bd. of Educ., 269 N.J.Super. 11, 24-25, 634 A.2d 538 (App.Div.1993), aff'd, 138 N.J. 405, 425, 650 A.2d 958 (1994) (allowing a CEPA claim even though employee did not know that safety guidelines he believed were being violated were based on state administrative code); Regan v. City of New Brunswick, 305 N.J.Super. 342, 353-55, 702 A.2d 523 (App. Div.1997) (reinstating complaint, where employee did not identify until appeal the criminal statutes he believed were being violated, on the basis that they were identifiable from the record and from the employee's description of the nature of the illegal conduct he suspected).
However, the court must make that identification before permitting trial of a CEPA claim under N.J.S.A. 34:19-3c. It "must first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true." Fineman v. New Jersey Dep't *471 of Human Servs., 272 N.J.Super. 606, 620, 640 A.2d 1161 (App.Div.1994), certif. denied, 138 N.J. 267, 649 A.2d 1287 (1994). The "value judgment" as to "whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law.... that must be made by the court, and not by the jury." Mehlman, supra, 153 N.J. at 187, 707 A.2d 1000.
There is, in addition, an obvious parallel to criminal cases which involve charges of possessing a weapon for an unlawful purpose. In such instances, a
jury is not qualified to say without guidance which purposes for possessing a weapon are unlawful and which are not. Therefore, a jury instruction on a charge of possession of a weapon for an unlawful purpose must include an identification of the unlawful purpose or purposes suggested by the evidence and an instruction that the jury "may not convict based on their own notion of the unlawfulness of some other undescribed purpose." State v. Jenkins, 234 N.J.Super. 311, 316, 560 A.2d 1240 (App.Div.1989). In addition, the trial judge should ... relate the specific unlawful purpose charge to the facts of the case.

[State v. Villar, 150 N.J. 503, 511, 696 A.2d 674 (1997).]
See also State v. Ricks, 326 N.J.Super. 122, 131, 740 A.2d 697 (App.Div.1999) ("Additional instructions provide guidance to the jury in understanding the [necessary] relationship[.]"), certif. denied, 163 N.J. 397, 749 A.2d 371 (2000); State v. Turner, 310 N.J.Super. 423, 432, 708 A.2d 1205 (App.Div.1998) ("[T]he jury may not [determine the issue before it] based on its own notion of ... unlawfulness[.]")
It is incumbent upon the claimant, therefore, to furnish the trial court with enough by way of proof and legal basis to enable the court to determine as a matter of law, on a threshold basis, that a statute, rule, or public policy would have been violated if the jury were to find that the conduct plaintiff alleges actually occurred. Only after the court identifies the asserted violation with adequate particularity may the jury consider the objective reasonableness of the plaintiff's belief that his or her information indicated the actual occurrence of such a violation. Schechter v. Div. of Gaming Enforcement, 327 N.J.Super. 428, 432, 743 A.2d 872 (App.Div.2000) (holding CEPA claim to have been properly dismissed because the court found that the disclosure "involves nothing more than a policy dispute"); Falco v. Community Med. Ctr., 296 N.J.Super. 298, 317, 686 A.2d 1212 (App.Div.1997) (holding CEPA claim to have been properly dismissed due to "the absence of such a public policy"), certif. denied, 153 N.J. 405, 709 A.2d 798 (1998); Young v. Schering Corp., 275 N.J.Super. 221, 235-37, 645 A.2d 1238 (App.Div.1994) (holding CEPA claim to have been properly dismissed because the challenged conduct was contrary to employee's principles or sense of company priorities, but was not "illegal" or "wrongful"), aff'd, 141 N.J. 16, 660 A.2d 1153 (1995); Catalane v. Gilian Instrument Corp., 271 N.J.Super. 476, 493-94, 638 A.2d 1341 (App.Div.) (holding CEPA claim to have been properly dismissed because employee's general invocation of federal labor and tax law was inadequate basis for reasonable belief in illegal activity), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994).
These principles apply to claims under both N.J.S.A. 34:19-3a and -3c. Demas v. National Westminster Bank, 313 N.J.Super. 47, 55, 712 A.2d 693 (App. Div.1998) (affirming dismissal on summary judgment of N.J.S.A. 34:19-3a claim because the plaintiff "could not cite `a law, or a rule or regulation' or even a clear mandate of public policy, violated by [the defendant]'s *472 behavior") (quoting N.J.S.A. 34:19-3a), certif. denied, 161 N.J. 151, 735 A.2d 575 (1999). The trial court here erred by failing to engage in the required analysis in order to determine whether or not to dismiss the CEPA claim, i.e., whether such a violation existed or not.
Once the plaintiff provides the court with some basis in the proofs to establish the existence of a violation of law or public policy and of a connection between the asserted retaliatory conduct and the violation, it is the court's duty to determine whether the matter should go to the jury, i.e., whether the violation of law or public policy alleged is real and whether there is evidence to support the connection. If such determinations have been made, the court must then carefully instruct the jury concerning the nature of the violation so as to preclude jury speculation about that element; and it must guide the jury in its function of determining whether, as a matter of fact, there was a connection between the violation and the asserted retaliation. The trial court here failed to discharge adequately its responsibility to so evaluate the proofs; and its charge to the jury was deficient, in all likelihood because plaintiff had established no sufficient basis in the proofs to support a fuller instruction.
The court made some rulings at the close of plaintiff's proofs. Among them was the following:
Now that leaves the CEPA claim and I must admit that this is a close question but I'm going to decide it at this stage of the proceeding in favor of the plaintiff. There is no question that the CEPA statute refers to an activity, policy or practice of the employer and Mr. Rubenstein [defendant's attorney] has very articulately argued that there was no showing here that the wrongful conduct was that of the employer. That is, the wrongful conduct of which the plaintiff was complaining. But the problem that I have with that is as Mr. Hawkins [plaintiff's attorney] also articulately argued we're dealing here with not a co-employee but with an individual who was in a supervisory capacity. I don't know whether there was a chief at the time or deputy chief who was the top ranking officer even though there was a chief or Chief Yuro was the only acting or deputy chief, still he held the position that was of sufficient supervisory authority to attribute his actions to the employer. So I think that the case should go forward with regard to any CEPA claim and the only prong of the CEPA claim that I think is pertinent is the first prong. That is the prong that has to do with the disclosure to a supervisor of an activity, policy or practice of the defendant that the plaintiff reasonably believes to be in violation of a law, rule or regulation. And I think that is clearly and simply the issue in this case.
I think the other counts and claims of the plaintiff are peripheral and as a matter of law I think they should be dismissed at this stage of the proceeding. So we're concerned with the actions of Deputy Chief Yuro and with regard to those alleged inappropriate actions, we're only concerned with the issuance of the gun permits and there are two issues that I perceive with regard to gun permits and those are the Toborowski issue and the other question that deals with Deputy Chief Yuro's approval of gun permits either for himself or his wife. I'm not sure what the circumstances were but there was a question of residency and those issues will have to be resolved and, therefore, I would call upon the defendant to call his witnesses.
This ruling lacked the necessary determination that the facts alleged by plaintiff *473 encompassed a violation of law or public policy.
After the close of all proofs, the judge began his instructions to the jury on the CEPA-violation aspect of the case by outlining the provisions of N.J.S.A. 34:19-3a and noting: "that is the only category in the Conscientious Employee Protection Act that is pertinent in this case." He went on to define "retaliatory action" and to summarize plaintiff's proofs in that regard. He continued:
The activity, policy or practice of the Perth Amboy Police Department that plaintiff contends he reasonably believed was a violation of a law or a rule, or regulation promulgated pursuant to law was the wrongful issuance of gun permits and he cites two instances. One involving the issuance of a gun permit to Toborowski and one involving the issuance of a gun permit to Deputy Chief Yuro.
The judge then explained that he had dismissed other claims and that the jury should confine its deliberations to the two gun permit questions. He then stated:

Also, you should not feel or speculate that because I did not decide the issuance of gun permit questions as a matter of law that I have a feeling or view on those questions one way or the other. These questions involving the issuance of gun permits are for your consideration and resolution. (Emphasis supplied).
* * * *
To establish the first element of his claim, that is the subject matter of question one, the plaintiff must prove by a preponderance or greater weight of the evidence that in light of the circumstances facing him and the knowledge which he possessed at the time he formed his belief, he had a reasonable belief that the defendant was violating the law or a rule or regulation promulgated pursuant to law. In making such a determination you are to consider whether the plaintiff possessed the qualifications necessary to establish a reasonable belief. In other words, you are to take into account plaintiff's educational background and employment obligations.
With regard to the reasonable belief requirement, you may have heard some testimony as to the outcome of the Prosecutor's Office investigation as to the satisfaction or nonsatisfaction of the residency requirement with regard to the issuance of Deputy Chief Yuro's gun permit application. That evidence is not pertinent to the issue of plaintiff's reasonable belief that his employer was engaged in an activity, policy or practice that violated a law or a rule or regulation promulgated pursuant to law. The ultimate outcome of the investigation is not the deciding factor. The presence or absence of a reasonable belief on the part of the plaintiff under all the circumstances at the time of the happening of the events in question is.
Under the Conscientious Employee Protection Act, plaintiff must show that his belief that illegal conduct was occurring had an objectively reasonable foundation in fact. In other words, that given the circumstantial evidence a reasonable person with the knowledge, education and employment background of the plaintiff would reasonably conclude that illegal activity was going on.
* * * *
The second element the plaintiff must establish in order to prevail is that he disclosed or threatened to disclose to a supervisor an activity, policy or practice of the employer that the employee reasonably believed was in violation of the law or a rule or regulation promulgated *474 pursuant to law. Thus, plaintiff must prove by a preponderance of the evidence that he, in fact, threatened to make his claim or actually made his claim of improper activity known to a supervisor. Plaintiff's own belief that certain conduct was improper or illegal is insufficient unless he threatened to disclose his belief or his belief was actually made known to a supervisor.
A supervisor is an individual within the defendant's organization who has the authority to direct and control the plaintiff's work performance, who has the authority to take corrective action regarding the violation of the law, rule or regulation of which plaintiff complains or who the defendant employer has designated to receive written notices concerning any activity, policy or practice in violation of a law or a rule or regulation of which an employee may complain.
* * *
In question three the plaintiff must prove that there was some adverse employment action taken against him. * * *
In question four, to prevail the plaintiff must show or prove by a preponderance or greater weight of the credible evidence that there was a causal link or connection between the plaintiff's action in making the disclosure and the adverse employment action of the defendant. Plaintiff must prove that the action which his employer took was retaliatory in nature. Plaintiff cannot prove his claim of retaliation merely by conclusory statements or by speculating that the action taken against him was in response to the disclosure he made or threatened to make. Rather, plaintiff must adduce tangible evidence of retaliatory action. He must adduce support for his feeling that the action taken against him was retaliat[ory]. You should note that evidence that the defendant's decision regarding the adverse employment action was made before plaintiff's disclosure or threatened disclosure is evidence that a retaliatory motive was not at work. Defendant cannot be charged with a retaliatory motive if you find that its conduct toward the plaintiff did not change perceptively following the disclosure or threatened disclosure of his allegations. And likewise the defendant cannot be charged with a retaliatory motive if you find that there were other legitimate reasons which were not pretextual, that is, not put forward to conceal the true purpose or object which justified the employer for taking the adverse employment action which it took against the plaintiff such as but not limited to incompetence, insubordination, disloyalty, reduction in work force or other legitimate reasons.
In the absence of a determination by the trial court that facts alleged by plaintiff could amount to a violation of law or public policy, these instructions were lacking an essential predicate. Especially with the emphasized passage, they invited the jury to make the determination that only the trial court was qualified to make.
We conclude, based upon the record and applicable principles of law that no adequate showing of a violation of law or public policy had been made.
The only provisions or sources of a prohibition against the issuance of either of the gun permits that plaintiff cited to the trial court and refers to on appeal are the statutes on the subject. The record does not indicate whether the applications were for permits to purchase a handgun or permits to carry one. The lack of this information is of little consequence, however, because for either type of permit the statutes do not clearly prohibit the flaws that *475 plaintiff alleged in respect of each of the applications.
N.J.S.A. 2C:39-10a(1) prohibits the knowing violation of "the regulatory provisions relating to ... permits to purchase certain firearms[.]" A "person who gives or causes to be given any false information, or signs a fictitious name or address" in applying for a gun permit is also guilty of a crime. N.J.S.A. 2C:39-10c. Applicants must provide their "residence," N.J.S.A. 2C:58-3e (purchase permit) and 2C:58-4b (carry permit), which for statutory purposes is "synonymous with the term `domicile.'" In re Berkeley, 311 N.J.Super. 99, 102, 709 A.2d 303 (App.Div.1998).
Neither of those statutes, nor any regulation or reported opinion, however, deals with the practice of allowing nonresident police officers to receive a gun permit from the municipality that employs them. There was uncontradicted testimony at trial that the practice was common and lawful, and the only flaw in Yuro's use of it that plaintiff cited was Yuro's failure to use the police station's proper street address. Because the application is not in the record on appeal, we cannot verify that defect, but accepting the assertion as accurate, the flaw nevertheless provides no adequate basis for satisfying the legal test for CEPA liability. The trial court, if it had conducted the proper threshold analysis required for a CEPA claim, would have been required to determine that so trivial a defect in an application which was proper in other respects could not have given rise to an objectively reasonable belief that Yuro had illegally obtained a permit that would otherwise have been denied.
With regard to the Toborowsky permit, the allegations that that former member of the Police Department was a "known" drug user and drug dealer implicate additional statutory qualifications for a permit to purchase a gun. A purchase permit may not be issued to "any person who has been convicted of a crime", N.J.S.A. 2C:58-3c(1); to "any drug dependent person as defined in" N.J.S.A. 24:21-2, N.J.S.A. 2C:58-3c(2); to "any alcoholic unless" he or she "produces a certificate of a medical doctor or psychiatrist" or "other satisfactory proof" that the condition would not hinder "the handling of firearms", N.J.S.A. 2C:58-3c(3); to "any person who knowingly falsifies any information on the application form", N.J.S.A. 2C:58-3c(3); or to "any person where the issuance would not be in the interest of the public health, safety or welfare", N.J.S.A. 2C:58-3c(5). These conditions also apply to the issuance of a permit to carry a gun. See N.J.S.A. 2C:58-4c.
However, because a permit may not be denied "entirely upon hearsay evidence", Weston v. State, 60 N.J. 36, 52, 286 A.2d 43 (1972), Yuro could not have rejected Toborowsky's application on the basis of the unsubstantiated rumors. Nor could he have rejected Toborowsky's application on the basis that the address he gave was for a "rooming house" above a bar, as there is no authority to support plaintiff's assertion that an applicant may not reside at such a location, and there is no evidence that the apartments at that location lacked the features needed to qualify as residential units. For those reasons, the elements of the permit application that plaintiff posited as spurious were nevertheless legally inadequate as the basis of an objectively reasonable belief that any illegality in connection with Toborowsky's permit had occurred. Finally, the revocation of Toborowsky's permit required court action, upon the application of the prosecutor or chief of police. N.J.S.A. 2C:58-4f. Although N.J.S.A. 2C:58-3 does not specifically provide a procedure for revoking a purchase permit, it is possible to do so upon a development indicating that the *476 applicant no longer meets the statutory conditions. See Hoffman v. Union County Prosecutor, 240 N.J.Super. 206, 215, 572 A.2d 1200 (Law Div.1990). We note that purchase permits are valid for only ninety days, N.J.S.A. 2C:58-3f, subject to renewal or non-renewal.
In this instance, however, the prosecutor had assumed the responsibility for revoking the license. Plaintiff gives no reason why the Police Department should be considered blameworthy simply for having failed to duplicate that effort. The derelictions plaintiff alleged were, in sum, simply too trivial to be a permissible predicate for a CEPA retaliation claim.
For the reasons we have outlined, we hold that the trial court erred by failing, in the first trial on CEPA "liability," to address the question whether plaintiff had sufficient basis for an objectively reasonable belief that either of the gun permits was illegal, or for an objectively reasonable belief that either permit was issued in violation of a public policy cognizable under CEPA. Our inspection of the record discloses that there was no adequate basis in the proofs and that the trial court, if it had addressed the essential question at an appropriate time, would have been required to dismiss these CEPA claims on the basis of deficiencies in plaintiff's proofs or, failing such a ruling, to grant defendants' motion for judgment notwithstanding the verdict.
At the very worst, the incidents that plaintiff cited as violative of law or public policy were judgment errors on the part of the officials involved and could not reasonably have been seen as the type of conduct upon which a CEPA claim may be premised. An employee against whom disciplinary action has been taken and emphatically upheld on administrative appeal and judicial review may not, without a substantially stronger showing than this plaintiff made, transmute his defense to the disciplinary charges into an affirmative CEPA claim. To allow such a result would clearly negate the public policy underlying CEPA and permit a validly disciplined public employee to frustrate the legislative intendment.
This disposition renders moot all the other issues raised on the appeal and the cross-appeal, as well as the reserved decision on plaintiff's invalidation motion before us. We reverse the judgment of the trial court and dismiss the complaint.
NOTES
[*] Subsequently, in In re Washington McLelland, A-4995-97 (App.Div. August 9, 1999), an unpublished opinion, we affirmed the Merit System Board's decision upholding the disciplinary action against plaintiff on charges of neglect of duty, insubordination, and conduct subversive of good order and discipline. Plaintiff had been suspended for sixty days and demoted from captain to lieutenant. The Merit System Board's determination was based on findings of fact implicating circumstances among which were those alleged at the basis of plaintiff's CEPA claim in this action.