873 A.2d 673 (2005)
377 N.J. Super. 585
Julius BEASLEY, Plaintiff-Respondent/Cross-Appellant,
v.
PASSAIC COUNTY, Defendant-Appellant/Cross-Respondent, and
Robert J. Garigliano and Milton James, Defendants/Cross-Respondents, and
Passaic County Department of Youth Services, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted March 15, 2005.
Decided May 26, 2005.
*677 Lum, Danzis, Drasco & Positan, Roseland, attorneys for appellant/cross-respondent (Richard A. West, Jr., of counsel; Mr. West and Nicole Cucci Kolb, on the brief).
Washington Garrick, Warren, attorneys for respondent/ cross-appellant (Paula A. Garrick, on the brief).
Eric M. Bernstein & Associates, attorneys for cross-respondents Robert J. Garigliano and Milton James (Eric Martin Bernstein and Philip G. George, of counsel; Mr. George, on the brief).
Before Judges LEFELT, FALCONE and KIMMELMAN.
The opinion of the court was delivered by
LEFELT, J.A.D.
A jury found Passaic County liable for violating the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, when it retaliated against plaintiff, Julius Beasley, who was a supervisory officer at the Passaic County Juvenile Detention Center. After the jury verdict was reduced to judgment, the County appealed, advancing several reasons why the liability judgment should be reversed. These reasons included, among others, that the actions taken against plaintiff cannot be considered retaliatory under CEPA, and that the court erroneously admitted hearsay testimony by plaintiff that he was told by the Center's Director that "downtown" wanted him fired. Plaintiff cross-appealed, contending the motion judge erred by dismissing plaintiff's continuing violation, emotional distress, and hostile work environment claims, and the trial judge erred by bifurcating the trial, allegedly resulting in an insufficient damage award. We reject plaintiff's cross-appeal, but reverse the liability judgment because the jury should not have heard the hearsay testimony regarding "downtown's" intentions. Accordingly, we remand for a new trial on liability.

I.
Because plaintiff's dispute with the County spans several years, our recitation of the relevant facts and procedural history is, of necessity, lengthy. Plaintiff began work at the Center in 1982 as a juvenile detention officer. He advanced through the available employee ranks and by the summer of 1993, the County had promoted him to one of seven commander, or supervisor, positions.
Before he was promoted, plaintiff testified on May 19, 1993, before a public meeting of the Board of Freeholders regarding the unruliness of the juvenile inmates and the need for metal detectors, the poor quality of the inmates' food, lack of proper training for new officers, the mandatory *678 sixteen-hour days and the need for more officers, an overly restrictive sick policy, and the County's failure to promote plaintiff to supervisor more expeditiously. At some point after the Board meeting, plaintiff claimed that the Assistant Director, James, plaintiff's immediate supervisor, told him that if he kept "going the way that you[`re] going, you're never going to be able to get employment . . . in this County."
The Bergen Record newspaper covered plaintiff's testimony before the Board. The story quoted the Center's Director, Garigliano, as describing plaintiff as a "disgruntled employee," and plaintiff as complaining about the Director's poor supervisory skills, lack of support, playing favorites in promotions, and being the root of the problems at the Center.
Plaintiff claimed that after the Board meeting, he became the subject of retaliation and was investigated numerous times, which, on some occasions, led to charges. As a result of one investigation, for example, plaintiff was suspended for three days without pay. However, the charges were dismissed in April 1994, and the County restored plaintiff's lost pay. Then, plaintiff received an absentee/lateness warning in 1996. In April 1997, there was an incident where three inmates escaped from the facility. As a result, the County brought neglect of duty charges against four officers. When plaintiff provided character evidence on behalf of the officers, Garigliano and James asked plaintiff why the hearing was any of his concern. Garigliano viewed plaintiff's appearance as "against the administration."
In June 1997, plaintiff was suspended for conduct unbecoming a public employee after the boyfriend of the mother of plaintiff's child charged that plaintiff had threatened him with a gun. Plaintiff was reinstated after a hearing on July 11, 1997. Another commanding officer testified that in such situations, officers are usually not suspended until indicted, and are assigned to another facility with pay. Plaintiff requested such a reassignment to no avail. In any event, county counsel concluded that regardless of the outcome of the charges, there was enough evidence to support at least a six-month suspension, and therefore plaintiff was suspended again on July 23, 1997. Six days later, after another hearing, plaintiff was again reinstated and, ultimately, no indictment was returned by the grand jury. During his two suspensions, defendant lost nearly $5,000 pay for twenty-four days of work. The County Personnel Officer wrote a memorandum in which she stated that the County should not "automatically repay suspension days without a fight. I would recommend that [plaintiff] file an appeal with OAL, we can then discuss this issue in a settlement hearing."
In September 1999, plaintiff was awarded back pay after pursuing an appeal to the Department of Personnel, which culminated in a favorable decision by the Merit System Board finding that the "criminal charges against him were dismissed and no administrative charge was sustained." The Merit System Board concluded that it was clear that the "County's initial suspension of [plaintiff] pending the disposition of the criminal charges was proper, [however,] such action does not relieve it from adhering to Merit System rules [and] once the charges were dismissed. . . . [plaintiff was] entitled to back pay for the 24 days he was suspended from work."
Around the end of 1996, the County's personnel director was instructed by the County Administrator to examine the amount of overtime earned by county employees. The director determined that plaintiff made $40,000 in overtime in 1996, when normal annual overtime was in the *679 $3,000 to $5,000 range, and that plaintiff had made $17,000 in overtime by April 1997, which if continued would result in annual overtime of approximately $60,000. The Center director, Garigliano, recognized that plaintiff was the "number one overtime earner," but for several years he ignored the County administration's complaints regarding plaintiff's overtime because he did not believe they were fair. This time, however, the County personnel director told Garigliano to cut plaintiff off from voluntary overtime, while retaining his eligibility for mandatory overtime, and Garigliano complied.
In August 1997, plaintiff was informed that the overtime slips he submitted would be credited for compensatory time because he was ineligible for overtime except in emergencies. Plaintiff claimed that he was the only officer so restricted, and another commander testified that plaintiff's overtime amounts, with some exceptions, were generally comparable to other commanders.
Plaintiff and four other commanders wrote a letter to one of the freeholders in November 1997 seeking a meeting regarding salary and work responsibilities. The commanding officers formed a union in the summer of 1998 and plaintiff became the shop steward in 1999. Plaintiff unsuccessfully asked the Center Director and Assistant Director and the County administration for more officers in 1999. According to one of the other commanders, the opening of a new building at the Center in 1998 magnified the staffing problem.
Plaintiff received an absentee warning after taking five days off between January 17 and March 16, 1999. In addition, in April 1999, plaintiff received a final warning for lateness, and was docked pay for pay periods in April, May, and June 1999. In addition, plaintiff was suspended for one day in June 1999 for excessive tardiness allegedly based on eight days despite plaintiff's understanding that the normal practice was to suspend an employee one day for every ten days late.
In August 1999, plaintiff discovered that the freeholders had authorized an increment raise for the commanding officers in February 1996, which had not been received by plaintiff and at least one other commander. Plaintiff filed a grievance, and he finally received his raise in April 2000, and a retroactive check a month or two later. Plaintiff and the other commander who had not received the 1996 raise were also finally placed on the same pay range step as the other commanders.
Plaintiff filed three incident reports in September 1999 regarding the need for more staff at the Center. Four days after the last incident report, and according to plaintiff, without prior warning, the Center suspended him for three days of excessive tardiness. Three days later, the Center docked plaintiff's pay for being fifteen minutes late during the final pay period in September 1999.
Because no response to the staffing needs was received from the Center Director or Assistant Director, plaintiff and other commanders complained once again to the freeholders at a board meeting that September. Plaintiff complained about the Director's leadership style and mismanagement, the quality of the Center's food, officers being disciplined for arriving fifteen minutes late after having worked a sixteen-hour day, and a shortage of staff. According to plaintiff, the County administration was "not too happy about that." Plaintiff also spoke to the press about these grievances and the resulting article quoted plaintiff as blaming the Center Director for most of the Center's problems.
In November 1999, plaintiff was docked pay for leaving fifteen minutes early with *680 permission during a pay period in early November. Plaintiff claimed he was the only commanding officer to receive such sanction.
In December 1999, Garigliano wrote plaintiff expressing his "outrage[]" that plaintiff was working voluntary overtime and advised him not to do so in the future. In response, plaintiff filed another incident report, complaining the staff was shorthanded. The Assistant Director responded, "this is what you have to work with."
In January 2000, Dolores Ferguson replaced Garigliano as the Center's Director. Plaintiff received an absentee warning in March 2000, and plaintiff claimed at the time he was "burnt out" and that he was having a drinking problem. Consequently, plaintiff filed a grievance regarding the absentee warning. Around this time, plaintiff testified that Ferguson told him that "downtown" wanted him fired. In April 2000, plaintiff was docked once again for reporting to work one hour late during an early April payday, and in that same month, plaintiff filed the complaint in this action.
Plaintiff's complaint, in ten counts, was filed against the County; the County Department of Youth Services;[1] defendant Robert Garigliano, the Center's Director; and Milton James, the Center's Assistant Director. Plaintiff alleged violations of New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49; emotional distress; breach of the covenant of good faith and fair dealing; negligent infliction of emotional distress; breach of a collective bargaining agreement; various intentional torts; violation of CEPA; hostile work environment; violation of the Equal Pay Act, N.J.S.A. 34:11-56.1 to -56.11; and tortious interference with an employment relationship.
One month after plaintiff filed his complaint, he sought a medical leave of absence from April 23 to May 15 for work-related stress, and filed a temporary disability claim to also begin on April 23. When plaintiff returned to work, he used sick leave to cover the time period from April 23 until May 15 because his temporary disability claim was denied. The claim was denied because plaintiff's illness was subject to workers' compensation. Plaintiff therefore requested to see the County's compensation doctor, but his request was denied. Plaintiff was then advised by the "workmens' comp people . . . that they [were] not going to pay for work related stress because they don't recognize work related stress." Plaintiff eventually filed a workers' compensation claim, which was denied for reasons that are not included within the record, with plaintiff's appeal of that denial pending at the time of his trial. In April 2000, plaintiff's request to withdraw money from his deferred compensation plan to pay his mortgage was also denied.
In May 2000, plaintiff was docked pay once again for reporting to work one hour late during an April pay period. On June 2, 2000, plaintiff was suspended for one day because of excessive absenteeism. After a hearing, plaintiff agreed to a verbal warning in lieu of the suspension. Nevertheless, a written warning was given instead.
In September 2000, plaintiff's shift was changed from the evening shift to the 7:00 a.m. to 3:00 p.m. shift. As a result, plaintiff lost a $4,684 "night differential" from his salary. Before the shift change, plaintiff had also been able to work part-time during the day at a children's center and was forced to discontinue this job after the *681 change. Also in September 2000, plaintiff filed a grievance after not being paid overtime for attending a required weekend meeting. Plaintiff eventually received the pay.
On the first day of his new shift, September 19, 2000, plaintiff was given a written reprimand because the facility was found to be in unsanitary condition. Another commander testified that he had never seen a deficiency memo given to a commander on the first day of a new shift. Plaintiff filed a grievance from the reprimand, and after a hearing, the grievance was dismissed as being without merit on November 27, 2000. The hearing officer found that the notice served on plaintiff was not a written reprimand, but instead merely indicated the conditions that were discovered and directed plaintiff "to advise his officers that these conditions would not be accepted." The hearing officer did not address whether the action implied criticism of plaintiff.
On September 21, 2000, after a juvenile assaulted one of the Center's officers, plaintiff was reprimanded for failing to file a report regarding the incident. Plaintiff subsequently filed a grievance claiming he was not aware of the assault. The grievance was denied after a hearing and, in a written memorandum, the hearing officer found plaintiff's testimony "totally false," finding that plaintiff was not only aware of the incident, but that he was also present. The hearing officer recommended that plaintiff be charged with conduct unbecoming a public employee because of the false testimony and the filing of "an unwarranted grievance." Consequently, in January 2001, plaintiff was charged with conduct unbecoming a commanding officer as a result of the incident and was to be suspended for three days commencing at a time "to be determined . . . later. . . ." There has not been a hearing on the charge. According to the County, the matter is no longer being pursued, though the record before us contains no Final Notice of Disciplinary Act dismissing the charge.
Plaintiff subsequently asked for a new shift because of continuing conflicts with, and harassment by James, allegedly stemming from sexual harassment charges plaintiff's former girlfriend had filed against James a number of years before. The request was apparently not granted.
Plaintiff was hospitalized for thirty-one days, from the end of March to the beginning of May 2001, for work-related stress. Plaintiff testified to financial problems, suicidal thoughts, and excessive drinking. Plaintiff was medicated during his hospitalization and underwent out-patient substance abuse treatment after he left the hospital.
After plaintiff returned to work, an incident occurred in late June 2001, where plaintiff discontinued a fire drill because residents were in an unsecure area and the Center was short staff. James reported the incident to Ferguson. Plaintiff wrote to Ferguson complaining about James because he believed he was being set up for an unjustified disciplinary proceeding. Plaintiff requested another immediate shift change due to his poor relationship with the Assistant Director, but received no response.
In August 2001, plaintiff was reprimanded for an incident where a female officer had urinated in a chair. Plaintiff was charged with belittling the officer by obtaining reports from several officers regarding the incident. Plaintiff claimed he was merely doing his job by collecting the reports and filed a grievance, but was not accorded a hearing.
Plaintiff received a letter dated November 8, 2001 from the assistant county counsel *682 informing him that he was the target of an administrative investigation pertaining to various acts alleged to have been committed by him, including neglect of duty and insubordination. However, no charges as a result of the investigation had been brought by the time of trial, and plaintiff's employment at the Center continued.
During pre-trial and trial motions, all counts of plaintiff's complaint except the CEPA count were dismissed. Before trial began, the trial judge bifurcated plaintiff's CEPA claim. Plaintiff's liability evidence was submitted to a jury, which returned a unanimous verdict in favor of plaintiff and against the County.
The jury found that the County had retaliated against plaintiff because he "disclose[d] to the Board of Freeholders an activity, policy or practice of the County which the plaintiff reasonably believed was in violation of State regulations regarding staffing of the Juvenile Detention Center." The jury also found that retaliation occurred specifically with regard to "[d]isciplinary action," "[i]nvestigations," "[w]ithholding salary raises or delay in paying same," and "[o]pposing plaintiff's workers' compensation claim," but not with regard to denying plaintiff's loan application from deferred compensation or requests for shift changes. The jury also found no cause of action with regard to the individual defendants, Garigliano and James.[2]
A different jury, after hearing plaintiff's evidence on damages, awarded plaintiff $24,205, consisting of $20,000 for personal injuries and $4,205 for a medical bill. Subsequently, the trial court awarded plaintiff, in addition to the $24,205, $4,235.24 in pre-judgment interest on the personal injury award, $127.50 in interest for one-year of the delay incurred by plaintiff in receiving the increment raise, $80,000 in attorney's fees, and $3,064.05 in costs plus interest.
After the court denied the County's motion seeking a new trial or judgment notwithstanding the verdict, the County appealed and plaintiff cross-appealed.

II.
At plaintiff's trial, the court allowed him to testify that Ferguson told him that "downtown" wanted plaintiff fired. We conclude that this evidence was mistakenly admitted and requires a reversal of the liability judgment and remand for a retrial on liability.
The "downtown" evidence was double hearsay by Ferguson and an unknown declarant who allegedly told Ferguson about downtown's intentions toward plaintiff. To be admitted into evidence, each component of the statement must separately be admissible under an enumerated exception to the hearsay rule. N.J.R.E. 805; see Spencer v. Bristol-Meyers Squibb Co., 156 N.J. 455, 463-64, 720 A.2d 601 (1998).
"[A] statement by a party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship is admissible in evidence against the party." In re Opinion 668 of the Advisory Comm. on Prof'l Ethics, 134 N.J. 294, 300, 633 A.2d 959 (1993) (citing N.J.R.E. 803(b)(4)). What Ferguson told plaintiff was admissible under N.J.R.E. 803(b)(4), but the included hearsay was not. See Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1003 (3d Cir.1988) (declarations of unidentified persons are rarely admitted).
In Lupo v. Voinovich, 235 F.Supp.2d 782, 792 (S.D.Ohio 2002), for example, plaintiff was told by the deputy director of *683 a state agency that the decision not to hire her for an agency position came from "the Director's office." In the resulting employment litigation, the court excluded the unattributed portion of the statement because it was impossible to determine whether a party-opponent was the declarant of the included statement. Id. at 793.
While plaintiff in this case initially stated that Ferguson referred to "County Counsel" as the source of her information, he subsequently clarified in definitive fashion that Ferguson told him that "downtown" wanted him fired. Because the statement was unattributed to any individual, the County had no opportunity to cross-examine the source of such information. Cf. Nobero Co. v. Ferro Trucking Inc., 107 N.J.Super. 394, 401-04, 258 A.2d 713 (App.Div.1969) (statement by fire chief that one of two of defendant's employees told him at the fire scene that they were using gasoline to wash paint off a truck when the fire in question started, held admissible as an admission by an agent because defendant could, and in fact did, call both employees who denied making the statement). Although it was probably generally understood by the parties that "downtown" referred to the County administration, it was impossible to discern the specific declarant and whether the statement was within that person's scope of employment. Carden, supra, 850 F.2d at 1003.
The trial court relied on Gresham v. Massachusetts Mutual Life Insurance Co., 248 N.J.Super. 64, 67, 590 A.2d 241 (App. Div.1991), where the court held admissible the testimony by plaintiff widow that the decedent had told her that the insurance agent in question told him that it was too late to convert his group life insurance policy into an individual policy. The court held the statement admissible to prove decedent's then state of mind and as a trustworthy statement by a deceased declarant, as well as an admission by the defendant insurer's agent. Id. at 67-68, 590 A.2d 241. Unlike the agent in Gresham, however, the declarant in this case is unknown, thereby raising reliability concerns.
For an improvidently admitted hearsay statement to warrant reversal, however, the possibility of an unjust verdict must be real and sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. Neno v. Clinton, 167 N.J. 573, 586, 772 A.2d 899 (2001). The statement that "downtown" wanted plaintiff fired was powerful evidence. Unchallenged, it could very well have given the jury a template by which to assess all of the actions taken against plaintiff. It could very easily have led the jury to conclude that these actions were taken as part of an effort by "downtown" to fire plaintiff. R. 2:10-2. This assessment may very well have led the jury to hold the County responsible and to characterize most of the actions taken against plaintiff as retaliation. Accordingly, the liability judgment against the County must be reversed and the issue remanded for retrial.

III.
Because a retrial is necessary, we address the County's other arguments. The County argues that plaintiff failed to prove a CEPA violation in two respects. First, the County claims plaintiff failed to establish that plaintiff performed a "whistle-blowing" activity, and second that plaintiff failed to establish that the actions taken against him by the County qualified as retaliation under CEPA. See Kolb v. Burns, 320 N.J.Super. 467, 476, 727 A.2d 525 (App.Div.1999) (explaining that for a plaintiff to maintain a CEPA action under N.J.S.A. 34:19-3(a), plaintiff must *684 establish that he or she reasonably believed that the employer was violating either a law, rule or regulation promulgated pursuant to law; that plaintiff performed a whistle-blowing activity; and that the employer took an adverse employment action against him or her in retaliation for the whistle-blowing activity.).

A.
The County notes that plaintiff admitted at trial that when speaking to the freeholders, he "didn't get into violation of the law." Thus, according to the County, plaintiff's CEPA claim was deficient because he failed to communicate his belief to the board that staffing at the Center was at illegal levels. We reject this argument.
CEPA does not require any magic words in communicating an employee's reasonable belief of illegal activity. "The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94, 707 A.2d 1000 (1998). CEPA is designed to protect employees who "blow the whistle" on illegal or unethical activity committed by their employers or co-employees, and as such, is remedial legislation that should be construed liberally to achieve its purpose. Estate of Roach v. TRW, Inc., 164 N.J. 598, 609-10, 754 A.2d 544 (2000).
It is not necessary for CEPA plaintiffs to show that a law, rule, regulation or clear mandate of public policy would, in fact, be violated if all that the employee discloses were true. Dzwonar v. McDevitt, 177 N.J. 451, 464, 828 A.2d 893 (2003). The complaining employee need not specifically articulate the "exact violation" that is occurring. Hernandez v. Montville Tp. Bd. of Educ., 354 N.J.Super. 467, 474, 808 A.2d 128 (App. Div.2002), aff'd o.b., 179 N.J. 81, 843 A.2d 1091 (2004).

B.
The County also argues that the alleged actions taken against plaintiff did not qualify as retaliation under CEPA. CEPA defines "retaliatory action" as the "discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). "The definition of retaliatory action speaks in terms of completed action." Keelan v. Bell Communications Research, 289 N.J.Super. 531, 539, 674 A.2d 603 (App.Div.1996) (dealing with the statute of limitations); see also Borawski v. Henderson, 265 F.Supp.2d 475, 486 (D.N.J.2003) ("Retaliatory action under CEPA is confined to `completed . . . personnel actions that have an effect on either compensation or job rank.'") (quoting Hancock, supra, 347 N.J.Super. at 360, 790 A.2d 186); Zamboni v. Stamler, 847 F.2d 73, 82 (3d Cir.), cert. denied, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988) ("[P]redict[ing] . . . that the New Jersey Supreme Court would confine the tort of unlawful retaliation to formal personnel actions that have an effect on either compensation or job rank. . . .").
Filing a CEPA or other complaint against an employer also "does not insulate [a] complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint." Higgins v. Pascack Valley Hosp., 158 N.J. 404, 424, 730 A.2d 327 (1999). "`Retaliatory action' does not encompass action taken to effectuate the `discharge, suspension or demotion.'" Keelan, supra, 289 N.J.Super. at 539, 674 A.2d 603. Therefore, an investigation of an employee is not normally *685 considered retaliation. E.g., Jones v. Fitzgerald, 285 F.3d 705, 715 (8th Cir. 2002); Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir.), cert. denied, 531 U.S. 816, 121 S.Ct. 52, 148 L.Ed.2d 21 (2000). An investigation, if conducted properly, should reveal "whether the basis for the complaint is reasonable." Higgins, supra, 158 N.J. at 424, 730 A.2d 327.
Where the affected party does not deny committing an infraction that resulted in discipline, the discipline cannot be considered "proscribed reprisal." Cf. Esposito v. Tp. of Edison, 306 N.J.Super. 280, 291, 703 A.2d 674 (App.Div.1997) (dealing with the LAD), certif. denied, 156 N.J. 384, 718 A.2d 1212 (1998). When plaintiffs are afforded a hearing and represented by counsel, plaintiffs "cannot claim that . . . substantiated disciplinary charges and resulting brief suspensions from work [are] retaliatory." Hancock v. Borough of Oaklyn, 347 N.J.Super. 350, 361, 790 A.2d 186 (App.Div.2002), appeal dismissed as improvidently granted, 177 N.J. 217, 827 A.2d 286 (2003). It would require a strong showing to "transmute [a] defense to the disciplinary charges into an affirmative CEPA claim." McLelland v. Moore, 343 N.J.Super. 589, 608, 779 A.2d 463 (App. Div.2001), certif. denied, 171 N.J. 43, 791 A.2d 221 (2002).
Adverse employment actions do not qualify as retaliation under CEPA "merely because they result in a bruised ego or injured pride on the part of the employee." Klein v. Univ of Med. & Dentistry, 377 N.J.Super. 28, 46, 871 A.2d 681 (App.Div.2005). CEPA's purpose is to prevent retaliatory action against whistle-blowers, it is not to "assuage egos or settle internal disputes at the workplace." Id. at 45, 871 A.2d 681.
In addition, rescinded employer action that makes plaintiff completely whole and remedies a prior decision cannot constitute an adverse employment action. See e.g., Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir.2001); Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir.1998), cert. denied, 526 U.S. 1065, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999); Lee v. N.M. State Univ. Bd. of Regents, 102 F.Supp.2d 1265, 1275 (D.N.M.2000); Almonte v. Coca-Cola Bottling Co. of N.Y., Inc., 959 F.Supp. 569, 572-73 (D.Conn.1997). In Horvath v. Rimtec Corp., 102 F.Supp.2d 219, 235 (D.N.J.2000), because plaintiff ultimately received the raise in question, the court found that plaintiff did not suffer any retaliation by way of an adverse employment action under the federal Age Discrimination in Employment Act. See Kadetsky v. Egg Harbor Tp. Bd. of Educ., 82 F.Supp.2d 327, 340 (D.N.J.2000) (plaintiff subsequently granted tenure and had incriminating materials taken out of his personnel file).
Besides discharges, suspensions, and demotions, which clearly affect an employer's compensation and sometimes job rank, CEPA retaliation also includes "other adverse employment action" taken against the employee's "terms and conditions of employment." Klein, supra, 377 N.J.Super. at 38, 871 A.2d 681. Terms and conditions of employment "refer[] to those matters which are the essence of the employment relationship," Township of West Windsor v. Public Employment Relations Commission, 78 N.J. 98, 110, 393 A.2d 255 (1978), and include further serious intrusions into the employment relationship beyond those solely affecting compensation and rank. The commonly understood meaning of the phrase includes, for example, length of the workday, Galloway Township Board of Education v. Galloway Township Association of Educational Secretaries, 78 N.J. 1, 393 *686 A.2d 207 (1978); increase or decrease of salaries, hours, and fringe benefits, Piscataway Township Educational Association v. Piscataway Township Board, 307 N.J.Super. 263, 271, 704 A.2d 981 (App. Div.), certif. denied, 156 N.J. 385, 718 A.2d 1214 (1985); physical arrangements and facilities, Board of Education of City of Englewood v. Englewood Teacher s' Association, 64 N.J. 1, 7, 311 A.2d 729 (1973); and promotional procedures, State v. State Supervisory Employees' Association, 78 N.J. 54, 90-91, 393 A.2d 233 (1978).
Our Supreme Court has stated in dictum that retaliation under CEPA "need not be a single discrete action." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448, 828 A.2d 883 (2003). According to the Court, an "adverse employment action taken against an employee in the `terms and conditions of employment,' N.J.S.A. 34:19-2e, can include . . . many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Ibid. We are "bound by carefully considered dictum from the Supreme Court." State v. Breitweiser, 373 N.J.Super. 271, 282-83, 861 A.2d 176 (App.Div. 2004), certif. denied, 182 N.J. 628, 868 A.2d 1031 (2005).
Especially considering Green, we do not read the CEPA retaliation definition as requiring all adverse employment actions to be the functional equivalent of a demotion or suspension. But see Klein, supra, 377 N.J.Super. at 38, 871 A.2d 681 (dealing with a disgruntled employee). "[E]mployer actions that fall short of [discharge, suspension, demotion, or transfer] may nonetheless be the equivalent of an adverse action." Cokus v. Bristol Myers Squib Co., 362 N.J.Super. 366, 378, 827 A.2d 1173 (Law Div.2002), aff'd, 362 N.J.Super. 245, 827 A.2d 1098 (App.Div. 2003), certif. denied, 178 N.J. 32, 834 A.2d 405 (2003). A pattern of conduct by an employer that adversely affects an employee's terms and conditions of employment can qualify as retaliation under CEPA.

IV.
The County also argued in its appeal that one of plaintiff's retaliation claims was time barred and another was precluded by the workers' compensation exclusivity provision. We reject both of these arguments.
The trial court correctly concluded that because the County continued to withhold plaintiff's salary until 2000, "the jury's finding [of retaliation] is not time barred." In essence, the County withheld plaintiff's increment for each year from 1996 until 2000. The retention of the increment was therefore not a single discrete action, but one that continued. Green, supra, 177 N.J. at 448, 828 A.2d 883.
The trial court also found that workers' compensation law did not provide the exclusive remedy for the allegation of retaliation based on the County's opposition to plaintiff's workers' compensation claim. We agree with this finding. Plaintiff is not seeking a remedy in this case for the denial of his workers' compensation claim, which is within the compensation court's exclusive jurisdiction, N.J.S.A. 34:15-49(a), but is merely including the County's opposition as evidence of retaliation under CEPA.

V.
In plaintiff's cross-appeal, he argues that the motion judge erred in limiting his LAD claim to acts that occurred after April 4, 1998, because the acts relevant to that claim before that date were part of a continuing *687 violation. Plaintiff also argues the motion judge erred in dismissing his claim for intentional infliction of emotional distress because state of mind questions were implicated. Plaintiff maintains the judge also erred in dismissing his hostile work environment claim because he was repeatedly forced to file grievances. All of these arguments are meritless.
At the close of the case, the trial judge dismissed plaintiff's LAD claim as being subject to CEPA's waiver provision. Young v. Schering Corp., 141 N.J. 16, 29, 660 A.2d 1153 (1995). Plaintiff did not appeal from that dismissal, and therefore, whether the motion judge properly limited the LAD claim is moot. Plaintiff's intentional infliction of emotional distress claim was also subject to CEPA's waiver provision. N.J.S.A. 34:19-8. In addition, defendants' conduct was not sufficiently extreme and outrageous to justify an intentional infliction cause of action. Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988). Plaintiff's hostile work environment claim was redundant in light of the CEPA action. To the extent it was separate from CEPA, it was also subject to the waiver provision. N.J.S.A. 34:19-8.
Plaintiff, in his brief, also lists the damages award as being against the weight of the evidence as one of the bases for his cross-appeal. He does not advance this argument in a separate point heading and failed to move before the trial court for a new trial. As a consequence, the weight of the evidence argument is not properly before us. R. 2:10-1; St. Joseph's Hosp. and Med. Ctr. v. Muirfield Constr. Co., 362 N.J.Super. 540, 547, 829 A.2d 652 (App.Div.2003).
Finally, plaintiff claims in his cross-appeal that he was prejudiced by the bifurcation decision because the separation of liability from damages resulted in an inadequate damage award. This argument is also meritless because the trial court's bifurcation decision was not an abuse of discretion. R. 4:38-2(b); Thompson v. Merrell Dow Pharm., Inc., 229 N.J.Super. 230, 255, 551 A.2d 177 (App.Div.1988).
We recognize that it is sometimes necessary to grant a new trial when proofs of damages were inadvertently withheld because they were thought to be germane only to damages, not liability issues. Malaker Corp. v. First Jersey Nat'l Bank, 163 N.J.Super. 463, 489, 395 A.2d 222 (App. Div.1978), certif. denied, 79 N.J. 488, 401 A.2d 243 (1979). Here, however, plaintiff testified at the damages trial regarding subjects relating to the liability trial, so that the damages jury did have an opportunity to hear from the main witness in the liability trial. And, there were no attacks during the liability trial on the believability of the injuries plaintiff suffered as a result of defendants' alleged retaliation that would have necessitated the introduction of medical testimony. Cf. Diodato v. Rogers, 321 N.J.Super. 326, 335-36, 728 A.2d 882 (Law Div.1998) (granting plaintiff's new trial motion because bifurcation prevented plaintiff from rebutting attacks on his credibility through the introduction of medical evidence explaining his injuries and the effect of those injuries on his ability to recall events).

VI.
For the reasons we have explained, we reverse the liability judgment against the County and remand for further proceedings consistent with this decision. Because plaintiff did not appeal from the no cause of action verdict in favor of James and Garigliano, plaintiff's liability claims on the remand shall proceed only against the County. We affirm the damage verdict, and we also affirm all motion and trial *688 judges' decisions challenged on the cross-appeal.
Affirmed in part, reversed in part, and remanded.
NOTES
[1] Because suit against the Department and County was superfluous, the complaint against the Department was dismissed, and the dismissal is not challenged on appeal.
[2] This portion of the jury's verdict is not being challenged on appeal.