**Dorothy LUPO, Plaintiff,**

v.

**George VOINOVICH, et al., Defendants.**

**No. 93–CV–458.**

United States District Court, S.D. Ohio, Eastern Division.

Dec. 12, 2002.

Alexander Morris Spater, Columbus, OH, for plaintiff.

Marion H. Little, and Bradley T. Ferrell, Zeiger & Carpenter LLP, Columbus, OH, for defendants.

## *MEMORANDUM AND ORDER*

HOLSCHUH, District Judge.

Plaintiff Dorothy Lupo has asserted a federal cause of action under 42 U.S.C. § 1983 against Defendants George Voinovich, former Governor of the State of Ohio, Frances Buchholzer, former Director of the Ohio Department of Natural Resources, and Peter Somani, former Director of the Ohio Department of Health, in their official and individual capacities, seeking recovery for various adverse employment actions that were allegedly taken based on her political affiliations in violation of her First Amendment rights. This matter is currently before the Court on Defendants' Motion for Summary Judgment.

## I. *INTRODUCTION*

### A. Factual Background

Plaintiff Dorothy Lupo, formerly an employee of the Ohio Department of Natural Resources ("ODNR"), filed this action pursuant to 42 U.S.C. § 1983, claiming that she was subjected to a series of adverse employment actions at the hands of the Voinovich administration because of her political affiliation and alleged friendship with Dagmar Celeste, the wife of former Democratic Governor Richard Celeste. Specifically, Plaintiff alleges that she was terminated from state employment in 1991, and later denied reemployment with the state in 1993 and 1994 because of her perceived association with the prior Democratic administration.

Plaintiff has a long history of civil service and served as Deputy Director of the Ohio Department of Industrial Relations ("DIR") during the Democratic Celeste Administration. However, in 1991, when the Voinovich Administration came into office, Plaintiff no longer served as Deputy Director of DIR, but had assumed a new position as a Natural Resources Administrator 4 (NRA–4) in ODNR's Division of Reclamation. Unlike her position at DIR, this position was "classified" under Ohio law, which meant that she could not be removed without cause, and that she had certain seniority rights that allowed her to "bump" into other positions if her job position was eliminated. Under this system, displaced employees could "bump" into other positions of the same or lower classification, so long as they were qualified, based on the number of "retention points" possessed, and whether they had "provisional" or "certified" status. An employee is initially granted "provisional" status, and must serve for two consecutive years in the same position in order to become "certified." The classification is important, because a provisional employee can-

not displace a certified employee regardless of the number of retention points held by each.

In May of 1991, Plaintiff's NRA-4 position was in fact eliminated by ODNR as a result of a reorganization. At the time, the Division of Reclamation operated with two employees designated NRA-4, Plaintiff and a Mr. Greg Cybulski. Although Plaintiff possessed a greater number of retention points, she had worked for ODNR for under 2 years, and was therefore still employed under a "provisional" status; consequently, she could not bump Mr. Cybulski, who had been in that particular position longer and therefore had "certified" status. On May 3, 1991, Plaintiff, who at the time was out on leave, was summoned into the office and hand-delivered a notice indicating that her position would be abolished effective May 17, 1991. Interestingly, Plaintiff was due to achieve certified status on May 19, 1991. Had the notice not been personally served on May 3, Plaintiff would have attained certified status, and therefore would have bumped Mr. Cybulski from his NRA-4 position when one of the two positions was abolished. Because Plaintiff was notified personally on May 3rd, however, Plaintiff, and not Mr. Cybulski, was displaced from the NRA-4 position. Consequently, Plaintiff "bumped" into a lower NRA-2 position in the Division of Soil and Water. After holding that position for several months, Plaintiff was advised on August 23, 1991 that she was being displaced from that position by an employee with greater seniority. At the time that she received the original notice of displacement, Plaintiff would have been entitled to bump into one of two NRA-1 positions occupied by employees with less seniority; however this first notice of displacement was rescinded on August 27, 1991, and was then followed by a second notice of displacement on September 4, 1991. Before the second notice of displacement became effective, however, the two remaining NRA-1 positions into which Plaintiff would have been entitled to bump were abolished, and Plaintiff was effectively laid off from ODNR.

As was her right as a classified employee under Ohio law, Plaintiff appealed these adverse employment actions to the State Personnel Board of Review(SPBR). Her claim was originally heard by an Administrative Law Judge, who concluded that ODNR acted in bad faith by ultimately removing Plaintiff from service in favor of other, less senior, employees through a series of calculated personnel maneuvers. (See Ex. C to Lupo Aff., which is Ex. 1 to Pl.'s Mem. Contra Def.'s Mot. for Summ. J.) Following a series of appeals, the Franklin County Court of Common Pleas ultimately agreed with the Administrative Law Judge and found that some of the actions of ONDR were taken in bad faith. (See Ex. D. to Lupo Aff., which is Ex. 1 to Pl.'s Mem. Contra Def.'s Mot. for Summ. J.). Specifically, the court found that the original abolition of Plaintiff's NRA-4 position was made in good faith and justified by efficiency concerns, but that her subsequent displacement from the NRA-2 position and resulting dismissal from the Department was the product of bad faith.[1] As a result of these state proceedings, Plaintiff was reinstated to an NRA-2 position at ODNR, and was awarded backpay. Plaintiff worked in this position until March of 2001, when she retired. (Lupo Aff. ¶ 20).

Additionally in 1993 and 1994, while her state appeal was pending, Plaintiff sought employment with the Ohio Department of

---

1. The ruling of the Franklin County Common Pleas Court was ultimately affirmed by the Franklin County Court of Appeals (See Ex. E to Lupo Aff., which is Ex. 1 to Pl.'s Mem. Contra Def.'s Mot. for Summ. J.).

Health. Plaintiff interviewed with numerous ODH employees regarding job openings in the Department for fiscal officers, but she was ultimately denied employment with ODH. Plaintiff alleges that her denial was improperly based on political affiliation.

### B. Procedural Background

Plaintiff originally filed this action in 1993, asserting a claim under 42 U.S.C. § 1983 against Defendants Voinovich and Buchholzer for alleged violation of her First Amendment rights. Plaintiff subsequently amended her complaint to add similar claims against Defendant Somani following the rejection of her employment applications by ODH in 1993 and 1994. Discovery was stayed in June of 1995 pending a final decision from the Franklin County Court of Appeals regarding Plaintiff's state law challenge to her dismissal, because it was believed that the state court decision could have some bearing on the issues in the federal action. The parties were ordered to advise Magistrate Judge Kemp when a decision was reached in the state court, so that the case in this Court could proceed in an appropriate manner. Although such a decision was reached just two months later on August 15, 1995, the parties, contrary to Magistrate Judge Kemp's order, never communicated that fact to the Court. Finally, in 1998, the Court, having heard nothing from the parties, set the case for trial in June of 1998.[2] Upon receiving notice of the trial date, the parties jointly moved to vacate the scheduled trial and subsequently engaged in discovery, which did not conclude until June of 2001. Defendants filed a Motion for Summary Judgment on October 31, 2001. Plaintiff responded with a Memorandum Contra on February 15, 2002, to which Defendants filed a reply on May 28, 2002.

### C. Plaintiff's Claim for Relief

As noted above, Plaintiff alleges a federal cause of action under 42 U.S.C. § 1983 for violation of her First Amendment rights, alleging that the disputed employment actions were improperly motivated by her political affiliation. Plaintiff seeks declaratory and injunctive relief, backpay, compensatory and punitive damages, attorney's fees and costs. The Court now turns to Defendants' Motion for Summary Judgment.

## II. *SUMMARY JUDGMENT STANDARD*

Federal Rule of Civil Procedure 56(c) provides:

> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The pur-

---

2. The parties have not given the Court any explanation for their failure to inform Magistrate Judge Kemp of the state court decision.

pose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir. 1978).

In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

"The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord*

*Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455–56 (6th Cir.1984), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION

■ To establish a § 1983 claim, a plaintiff must show that she was deprived of a federal right by a person acting under the color of state or territorial law. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Jones v. Union County, TN,* 296 F.3d 417, 423 (6th Cir.2002). In the current case, the individual Defendants, as state government officials, were clearly operating under the color of state law. Consequently, if the Defendants are found to have violated Plaintiff's federal constitutional rights, they will be liable under § 1983.

### A. Plaintiff's § 1983 Claims Against Defendants in Their Official Capacities [3]

#### 1. Plaintiff's Claims for Monetary Relief Against the State are not Cognizable Under § 1983 and are Barred by the Eleventh Amendment.

■ When a plaintiff asserts a § 1983 cause of action against a state official in

---

**3.** Under Rule 25(d) of the Federal Rules of Civil Procedure, when a public officer is sued

in his official capacity, and during the pen-

his official capacity, the claim is treated as if brought against the governmental entity itself. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). When, as in the current case, the government entities are "arms of the state government," a plaintiff is restricted, both by the language of § 1983 as interpreted by the Supreme Court and by the Eleventh Amendment, in the type of relief that may be sought.

■ The Eleventh Amendment generally bars federal court jurisdiction whenever a private plaintiff attempts to sue a state government directly. *Mixon v. State of Ohio,* 193 F.3d 389, 396–97 (6th Cir. 1999) *citing Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). However, there are some exceptions to the immunity recognized by the Eleventh Amendment. A plaintiff may directly sue a State for damages in federal court when a State consents to the suit, or if the case concerns a federal statute that was passed by Congress pursuant to Section 5 of the Fourteenth Amendment and expresses a clear congressional intent to abrogate state immunity. *Mixon,* 193 F.3d at 397.

■ With respect to the current case, the State of Ohio has not waived its sovereign immunity in federal court. *Mixon,* 193 F.3d at 397 *citing State of Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449, 460 (6th Cir.1982).[4] In addition, the Supreme Court has held that the federal statute invoked in this case, 42 U.S.C. § 1983, was not intended to abrogate the States' Eleventh Amendment immunity. *Quern v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Consequently, Plaintiff is barred from asserting any claims against the state, or against the state officials in their official capacity, seeking monetary relief.

Furthermore, as a matter of statutory construction, the Supreme Court has held that a state government is not a "person" as that term is used in 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Guided in part by the principles of sovereign immunity embodied in the Eleventh Amendment, the Court in *Will* found that § 1983, by its language, does not apply to state entities, because Congress did not intend the word "person" to include such entities. Consequently, even aside from its general Eleventh Amendment immunity, a state is beyond the reach of § 1983 as a matter of statutory construction, and cannot be liable for money damages arising from the alleged constitutional violations of its agents.

■ However, in an important footnote, the Court in *Will* indicated that its holding in no way limits the ability of plaintiffs to sue for prospective injunctive relief against state officials under the longstanding doctrine of *Ex Parte Young. Will,* 491 U.S. at 71, n. 10, 109 S.Ct. 2304. Such suits challenging the constitutionality of a state official's actions are not considered suits against the state. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89,

dency of the litigation leaves office, the officer's successor is automatically substituted as a party. Consequently, with respect to Plaintiff's claims against the Defendants in their official capacity, the Court substitutes Ohio Governor Bob Taft, Ohio Department of Natural Resources Director Samuel W. Speck, and Ohio Department of Health Director J. Nick Baird, M.D. for the current named Defendants in their official capacities only.

4. The fact that this litigation has been ongoing for a long period of time cannot operate as a waiver of Ohio's sovereign immunity. Such immunity can only be waived by the state legislature or, in some instances, the Ohio courts. *Mixon,* 193 F.3d at 397, n. 7.

102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Hafer v. Melo*, 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). As a result, Plaintiff's claim, to the extent that it seeks reinstatement to the state agencies, is both cognizable under the language of § 1983, and permissible under the Eleventh Amendment. In all other respects, Plaintiff's claims against the Defendants in their official capacities are barred.

### 2. Plaintiff's Claim for Prospective Injunctive Relief

■ As mentioned above, Plaintiff, in addition to monetary damages, seeks "the opportunity to assume any positions at the Ohio Department of Natural Resources and Ohio Department of Health that she was unlawfully denied." (Pl.'s Second Am. Compl. at 11). It should be noted, at the outset, that this is not a case involving an employee who has been wrongfully discharged from her employment and is seeking an injunction ordering that she be re-employed and awarded backpay. Nor is it a case involving an employee who has been wrongfully demoted or transferred to another position, and is seeking an injunction ordering that she be returned to her original position and awarded backpay in an amount that represents the difference in compensation between the respective positions. Instead, it is a case in which a plaintiff who was discharged from her employment successfully obtained a judicial decision that found the discharge to be unlawful, was consequently reinstated to employment and awarded backpay, and remained in the position to which she was reinstated until she retired.

The essence of Plaintiff's claim is that—although she was reinstated by her employer—she should have been rehired by her employer in a different position during the time that she was unemployed (i.e. in the Ohio Department of Health) and, when finally reinstated, she should have been reinstated to a different position in the Ohio Department of Natural Resources (i.e. to an NRA–4 position instead of an NRA–2 position). It seems clear that if Plaintiff were able to establish her claim that the discharge from employment, and the refusal to re-employ her while discharged, were in violation of Plaintiff's First Amendment rights, she would be entitled to recover damages in the form of any lost wages and benefits from the time of her discharge until the time of her retirement. Such an award would fully compensate Plaintiff for the violation of her right to employment free of political discrimination. In the Court's view, Plaintiff would not be entitled—in addition to full monetary compensation for the wrongdoing—to an order compelling the State of Ohio to re-employ her after she voluntarily retired from her employment and to give her a second career of employment in addition to the one she had and voluntarily relinquished by electing to retire and receive the benefits—monetarily and otherwise—of retirement. Such an order would presumably require "bumping" an incumbent employee, *see LaFleur v. Wallace State Community College*, 955 F.Supp. 1406, 1426 (M.D.Ala.1996)(denying reinstatement in part because "there is nothing in the record to indicate that the position is not presently filled" and reinstatement is an extraordinary remedy to be used only when "absent 'bumping' Plaintiff's relief will be unjustly inadequate."). Equally, if not more importantly, such an order would require Plaintiff's previous employer—who reinstated her in compliance with state judicial decisions, and continued to employ her until she decided to retire—to give to Plaintiff, in addition to full compensation for any monetary damages suffered during that career, a second career of state employment.

 Furthermore, Plaintiff has failed to present sufficient evidence of the liability of Defendants in their official capacities to warrant a denial of Defendants' Motion for Summary Judgment. To establish liability in an official capacity suit under section 1983 a Plaintiff must show either that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, or that the official possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner. *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir.1989).

Plaintiff has presented no evidence that her discharge from the Ohio Department of Natural Resources or her inability to obtain a position with the Ohio Department of Health was the result of an unconstitutional governmental policy or custom. Although Plaintiff argues that the Voinovich Administration "instituted a policy of eliminating Celeste holdovers," the only evidence presented to support such a contention is a statement by Stratford Shields, who was deputy director of personnel for the Voinovich Administration, to the effect that the administration had a list of *high-level unclassified* employees who should probably be terminated with the change in administrations. (Pl.'s Mem. Contra Def.'s Mot. for Summ. J. at 7–8). However, evidence tending to show any policy of eliminating *senior-level* employees in *unclassified* positions is wholly irrelevant to the current claim by Plaintiff, who contends that she was a *constitutionally protected, classified* employee. In fact, under the *Elrod/Branti* exception to the general prohibition against political patronage, officials in the Voinovich administration generally would have had the right to replace senior-level unclassified employees based solely on political considerations. *See Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 371–72 (6th Cir.2002). Consequently, any evidence indicating such a policy provides no support for Plaintiff's claim that the administration had a policy of removing lower-level employees who may fall outside of the *Elrod/Branti* exception.

There is also insufficient evidence in response to Defendants' Motion for Summary Judgment that the named Defendants in this action, who had final authority over the discharge and employment of Plaintiff, used that authority in an unconstitutional manner. This is discussed at length in the following section dealing with Plaintiff's claims against the Defendants in their individual capacities.

### B. Plaintiff's § 1983 Claims Against Defendants in Their Individual Capacities

 Having found summary judgment proper for the Defendants in their official capacities, the Court now turns to the issue of Defendants' liability in their individual capacities. Even assuming that Plaintiff was indeed the subject of unconstitutional misconduct, Defendants Voinovich, Buchholzer, and Somani will be liable in their respective individual capacities only if they "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). At a minimum, a plaintiff must show that the supervisor "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* Merely having a right to control employees is not sufficient to impose liability, nor is a mere showing that the individual defendant was aware of the misconduct. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir.1996). As will be discussed in further detail below, Plaintiff has not presented sufficient evidence to indicate that any of the individual Defendants participated in the alleged

misconduct in such a way as to warrant liability under § 1983.

### 1. Liability of Former Governor Voinovich

█ Plaintiff has presented no evidence that Governor Voinovich was personally involved in any of the disputed employment decisions. Again, Plaintiff alleges that Governor Voinovich instituted a policy of removing "Celeste holdovers," but provides no evidence to support such an allegation. As mentioned above, any evidence that the administration sought to replace high-level unclassified employees is irrelevant to the issue here, which is whether Defendant Voinovich instituted a policy of removing *lower-level classified employees* perceived to be associated with the Celeste Administration. To the contrary, Plaintiff has failed to produce any evidence that Defendant Voinovich participated in, encouraged, implicitly authorized or even knowingly acquiesced in the adverse employment actions taken against Plaintiff. In the absence of any such evidence of direct involvement, the Court hereby **GRANTS** summary judgment to Defendant Voinovich in his individual capacity.

### 2. Liability of Former Director of ODH, Peter Somani

█ Plaintiff has presented no direct evidence that Defendant Somani was personally involved in the denial of Plaintiff's application for employment with ODH. Plaintiff bases her claim against Dr. Somani entirely on inference drawn from Dr. Somani's position as Director of ODH and two statements made by employees in the ODH personnel department: one alleging that the decision not to hire came from "the Director's office," [5] and one indicating that "the administration" did not want to hire Plaintiff because she was a Democrat.[6] However, neither of these statements indicates who in "the Director's office" or in "the administration" made such a decision, and none of the statements implicates Dr. Somani specifically. While the Court finds that the statement broadly attributing the decision to "the administration" is too vague to implicate the involvement of Dr. Somani personally, the statement that the decision came from "the Director's Office" causes the Court some pause. A reasonable jury could infer that an order not to hire originating from "the Director's Office" would have come from the Director himself.

█ That being said, the statement implicating "the Director's Office" cannot be considered on this Motion for Summary Judgment, because the Court finds it to be inadmissible hearsay. F.R.Civ.P. 56(e); *Sperle v. Michigan Dept. of Corrections*, 297 F.3d 483, 495 (6th Cir.2002) ("[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."); *citing Weberg v. Franks*, 229 F.3d 514, 526, n. 13 (6th Cir.2000). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." F.R.Evid. 801(c). In the current case, the allegedly incriminating statement fits the general hearsay definition. Plaintiff indicates in her deposition that:

> [Deputy Director Linda Trout] had extended an offer of the employment, and when the offer was rescinded, I talked to her briefly. And she indicated that this decision had come out—the rescission of the offer had come out of the director's office.

---

**5.** Statement by Deputy Director Linda Trout to Plaintiff Dorothy Lupo (Lupo Dep. 74).

**6.** Statement by Mr. Blackenberry. (Blackenberry Dep. 80)

(Lupo Dep. 74). Clearly this statement is being offered to prove the truth of the matter asserted, namely that the order not to hire Plaintiff came from the Director's Office, and therefore fits the general definition of hearsay. In fact, Plaintiff's statement presents two potential levels of hearsay. The first level of potential hearsay is the out of court statement by Ms. Trout to Plaintiff, and the second is the unattributed statement made to Ms. Trout by an unidentified source presumably indicating that the decision not to hire came from the Director's Office. Under Fed.R.Evid. 805, both levels of hearsay must be admissible prior to admitting such "double hearsay" into evidence. While Ms. Trout's statement to Plaintiff is likely admissible as non-hearsay under Fed.R.Evid. 801(d)(2) because she was an agent of the party-opponent discussing a matter within the scope of her agency or employment, the unattributed statement necessarily incorporated by Ms. Trout is inadmissible hearsay.[7] As the First Circuit has recognized, "unattributed statements repeated by party-opponents cannot be admissible. As the original declarant is unknown, it is impossible to determine whether the original declarant also fits within the party-opponent definition." *Vazquez v. Lopez–Rosario*, 134 F.3d 28, 34 (1st Cir.1998). In *Vazquez*, a former employee of a government contractor sued his former employer under § 1983, claiming that his job was eliminated because of his political affiliation. To support his claim, the plaintiff sought to introduce testimony from some fellow employees that they were told (or had heard) that the defendant disliked plaintiff. The District Court excluded any such testimony as hearsay. On appeal, the First Circuit affirmed the District Court, noting that "nothing in the record identi-

fies the source of this information." *Id.* As in *Vazquez*, there is nothing in the record of the current case that discloses the source of Ms. Trout's information (whether it came from someone in the Director's Office or from some other source purportedly relaying a message therefrom). As a result, the Court will not consider such evidence for purposes of this summary judgment motion.

Consequently, Plaintiff is left inferring Dr. Somani's personal involvement based solely on his position of authority; the Court finds that such an inference not only ignores the realities of a bureaucratic hierarchy, but would also be tantamount to imposing the very sort of *respondeat superior* liability expressly rejected by the case law interpreting § 1983. As discussed above, the Sixth Circuit requires some sort of direct involvement, whether through encouragement, participation, or at the very least knowing acquiescence, in order to impose liability under § 1983. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). Permitting a jury to infer such direct involvement based on a defendant's supervisory position alone would circuitously eviscerate the *Bellamy* standard for supervisor liability under § 1983, and would replace it with the functional equivalent of *respondeat superior*, holding supervisors liable for all actions taken by employees within their control and to which they had reasonably delegated authority.

■ As an alternative to the argument that a jury may infer Defendant's direct involvement by virtue of his position, Plaintiff contends that Director Somani's delegation of hiring decisions itself constituted a form of direct involvement. While such an argument may have superficial

---

7. Furthermore, Ms. Trout cannot be located to testify, despite counsel's best efforts, so there is little potential that the source of her

statement could be revealed. (Spater Aff. ¶ 4, Ex. 2 to Pl.'s Mem. Contra Def.'s Mot. for Summ. J.)

appeal, and indeed finds some arguable support in certain language used by the Sixth Circuit, such an expansion of supervisor liability again comes precariously close to adopting a *de facto* theory of *respondeat superior*, given both the reality and necessity of substantial delegation within a bureaucratic state agency.[8] Plaintiff relies on the Sixth Circuit's decision in *Leary v. Daeschner*, 228 F.3d 729 (6th Cir.2000) for the proposition that a supervisor may be liable under § 1983 for constitutional violations resulting from his delegation of a particular responsibility. *Id.* at 740. In *Leary*, numerous elementary school teachers sued the district superintendent alleging that they were transferred to other schools in retaliation for exercising their First Amendment rights. Because the Sixth Circuit in *Leary* affirmed the District Court's finding that no constitutional violation had occurred, the Court did not need to reach the issue of whether the district superintendent himself, as a supervisor, would have been liable under the *Bellamy* standard for any alleged constitutional violation. However, the superintendent had argued that he could not be liable as a supervisor in any event because he did not personally know the plaintiffs, and therefore could not have had a retaliatory motive for approving their transfers. The Court expressed its doubts as to the merits of such an argu-

ment, noting that the superintendent "could possibly be held responsible for failing to perform his job properly or for acquiescing in the constitutional violations resulting from his delegation of this responsibility." *Id. citing Taylor v. Michigan Dept. of Corrections*, 69 F.3d 76, 81–82 (6th Cir.1995).

While the Court's dicta in *Leary* is not controlling law, it does strongly indicate that a supervisor most likely cannot "insulate himself from liability for violating [a plaintiff's] First Amendment rights merely by showing that he did not know the [plaintiff] personally." *Id.* Consequently, a supervisor cannot take solace from the mere fact that he had delegated responsibility for the challenged action to lower echelon employees. *But see Kennard v. Wray*, No. 93–3138, 1994 WL 56932 (6th Cir.1994)(unpublished disposition)(supervisor not individually liable for alleged demotion based on political affiliation where supervisor delegated his authority on lower-level personnel decisions and did not personally make the disputed employment decision). Although the Court in *Leary* seems to indicate that delegation alone cannot be used as a shield from supervisor liability, the Court did not indicate that delegation alone could serve as a hook on which to hang such liability. Indeed, a closer analysis of the decision in *Taylor*,

---

**8.** Noting the express causation requirement contained in § 1983, the Supreme Court has specifically cautioned against expanding liability under the statute in such a way as to create *"de facto respondeat superior"* liability. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 391–92, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Court in *City of Canton* held that a city could only be liable for "failing to train" its police officers if such a failure amounted to "deliberate indifference" to its citizen's rights, which would indicate essentially that the governmental entity had a "policy or custom" of inadequate training that "caused" the constitutional violation to occur. The Court recognized that imposing

§ 1983 liability "on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell.*" *Id.* While *City of Canton* dealt specifically with *municipal* liability, the same concern arises in the context of *individual* liability; both the municipality and the individual are considered "persons" under § 1983, and liability with respect to each is subject to the explicit causation requirement contained therein. Consequently, *respondeat superior* liability, whether explicit or *de facto*, cannot be imposed under § 1983, regardless of whether the defendant is an entity or an individual. *See e.g. Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984).

which was relied upon for the language used by the Sixth Circuit in *Leary*, reveals that something beyond mere delegation is required in order to justify § 1983 liability.[9]

In *Taylor*, a prison inmate who was raped after he was transferred to another facility brought a § 1983 claim against the warden alleging that the warden should have had policies in place to review the transfer of inmates susceptible to abuse. The warden argued that he could not be liable for the injuries caused by the plaintiff's transfer because he had delegated responsibility over such transfers to his subordinates. *Taylor*, 69 F.3d at 80–81. The Court rejected that argument, noting that plaintiff had accused the warden of personally abandoning the duties of his position by failing to establish a procedure by which transfers would be adequately reviewed. Importantly, the plaintiff did not attempt to hold the warden liable for the particular discreet act of his transfer (an act in which the warden played no role); in contrast, plaintiff claimed that his transfer was caused by the warden's failure to adopt and implement an appropriate operating procedure to handle such transfers in the face of actual knowledge of a breakdown in the proper workings of the department. Therefore, the Court in *Taylor* did not hold that delegation could be used as a lynchpin for § 1983 liability, but rather that delegation could not be used to avoid liability where the supervisor fails to perform the specific duties of his position—in that case, adopting and implementing an appropriate inmate transfer

procedure (not handling the transfers himself).

Unlike Taylor, the plaintiff in the current case has produced no evidence that Director Somani failed to adopt or implement proper hiring procedures in his Department; rather, Plaintiff seeks to hold the Director personally accountable for the discreet employment decisions made with respect to Plaintiff's particular employment applications. Plaintiff points to no evidence implicating Director Somani in those decisions, nor does she present evidence that Director Somani failed to properly perform his job in any way, save the unpersuasive contention that his delegation of personnel decisions itself amounted to such a failure. Plainly, liability cannot rightly be imposed under § 1983 based solely on the fact of delegation.

Finally, in response to Plaintiff's claims, Director Somani indicates that he had absolutely no involvement in the hiring of any Fiscal Officer 2 personnel, but that such decisions were delegated to other management personnel in the department. (Somani Aff. ¶ 5–6). Plaintiff argues that such a denial of involvement "is the type of testimony of interested parties that a jury might disregard." (Pl.'s Mem. Contra Def.'s Mot. for Summ. J. 35) While it is true that the Court must view the evidence presented in the light most favorable to the plaintiff, the Court is not obligated to ignore all evidence that supports the defendant's position. Here, Director Somani has unequivocally denied any involvement in or knowledge of the denial of Plaintiff's

9. Because the discussion of supervisor liability in *Leary* is merely dicta, the Sixth Circuit's application of those principles to the facts of the case is not fully developed. However, the Court noted that, for example, "[the superintendent] might be liable if the plaintiffs can show that he encouraged his subordinates to transfer teachers who were particularly vocal in speaking out against school policy through

his mandate to transfer those teachers who were not 'team players.'" *Leary*, 228 F.3d at 740. Certainly, any such active encouragement may provide the extra ingredient, beyond the mere fact of delegation, with which to justify imposing personal liability on the superintendent. Such an ingredient is lacking in the case of Dr. Somani.

applications with ODH. Considering this evidence along with the dearth of evidence presented by Plaintiff, the Court finds that no genuine issue of material fact exists with respect to Director Somani's involvement, and that the evidence presented establishes that he played no role in the adverse employment actions taken against Plaintiff. Consequently, Director Somani cannot be liable in his individual capacity under § 1983, and the Court hereby GRANTS summary judgment in his favor.

### 3. Liability of Former Director of ODNR, Frances Buchholzer

■ Plaintiff has likewise failed to present sufficient evidence indicating the involvement of Director Buchholzer in any alleged unconstitutional actions taken at ODNR. Aside from merely inferring such involvement from the authority of her position as Director, Plaintiff relies on a statement allegedly made to Ms. Lupo by Glen Kiser, indicating that he was told by an unknown source that Plaintiff's position was being abolished by "the administration" because she was perceived to be a personal friend of Dagmar Celeste. (Lupo Dep. 185–86). Mr. Kiser denies ever making such a statement. (Kiser Dep. 86). Again, even assuming that such a statement was made, and ignoring the potential hearsay issues, the Court finds that a vague statement referencing "the administration" is insufficient to implicate the personal involvement of Director Buchholzer.

■ The only remaining evidence presented linking Director Buchholzer to any of the adverse employment actions taken against Plaintiff is the fact that she signed a letter to the Ohio Department of Administrative Services requesting that the NRA–4 position be abolished. However, Defendant has presented unrefuted evidence demonstrating that such a signature was merely a ministerial act, and that the Director played no role in the decision to abolish that or any other position. According to Defendant Buchholzer's testimony:

> [p]ersonnel made those decisions. I did not specifically make a decision whether a job was to be abolished. That was between personnel working with the chiefs and the fiscal officer to make sure that the various divisions were being run appropriately and met budget.

(Buchholzer Dep. 31–32). Ms. Buchholzer's testimony is supported by the statements of Chief Glen Kiser, who indicates that *he* made the decision to reorganize his division and abolish Plaintiff's position in an effort to "flatten" the management system in order to more efficiently and effectively run his operation. (Kiser Dep. 58–75; Kiser Aff. ¶ 3–4). Again, the only evidence offered by Plaintiff to rebut this testimony is the statement allegedly made by Kiser that "the administration" wanted to abolish Plaintiff's position because of her perceived political affiliation. As mentioned above, however, such a statement, even if admissible and accepted as true, does not create a genuine issue of material fact with respect to Director Buchholzer's involvement (or lack thereof) in the decision to abolish Plaintiff's NRA–4 position. Because the evidence presented indicates that Director Buchholzer took no part in the decision-making process resulting in Plaintiff's separation from employment at ODNR, Plaintiff is again left claiming that Director Buchholzer should be liable under § 1983 based solely on her delegation of authority over personnel matters within the Department. However, as the Court discussed above with respect to the liability of Director Somani, a supervisor cannot be held liable under § 1983 for the actions of his employees simply because the supervisor had delegated to those employees certain responsibilities.

Simply put, Plaintiff has failed to produce any evidence upon which a reasonable jury applying the *Bellamy* standard could impose individual § 1983 liability on Director Buchholzer. There is no evidence indicating that Ms. Buchholzer encouraged, participated in, implicitly authorized or knowingly acquiesced in any of the allegedly unconstitutional conduct. At most, Director Buchholzer "rubber-stamped" a decision made by lower-level managers to whom the Director had reasonably delegated certain responsibilities, and on whose judgment the Director was forced to rely in the operation of a large state bureaucracy. If such "participation" were sufficient to warrant individual § 1983 liability on the part of supervisors, then little could be done within a state government that would not expose those in positions of authority to potentially crippling liability, not only in their official capacities as government agents, but more importantly in their personal capacities. Even assuming that Plaintiff could demonstrate that her constitutional rights have been violated (an issue upon which the Court expresses no opinion), the Plaintiff has presented insufficient evidence to attribute any alleged violations to the individual Defendants in this case. In light of the fact that Plaintiff has produced insufficient evidence to hold Defendants liable for the alleged actions, the Court hereby **GRANTS** summary judgment to Director Buchholzer, the remaining Defendant, in her individual capacity.

## IV. CONCLUSION

As a final note, the Court recognizes that Plaintiff has presented certain evidence indicating that she may have been unfairly treated by persons at ODNR or ODH. The fact that her treatment by ODNR was successfully challenged in state court, resulting in an award of backpay and reinstatement, lends obvious credence to her contention that these decisions were somehow improperly motivated. What Plaintiff has failed to show, however, is why the individual Defendants in this case should be liable on the basis that they were somehow responsible for a violation of Plaintiff's rights under the First Amendment. In absence of evidence indicating some manner of personal involvement, liability cannot be imposed on an individual under § 1983.

In light of the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment with respect to all of Plaintiff's claims against all Defendants in their official and individual capacities.

**IT IS SO ORDERED.**