**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4024-18

RICK RUSSO,

     Plaintiff-Appellant,

v.

CITY OF ATLANTIC CITY,
ANTHONY COX, and DALE
FINCH,

     Defendants-Respondents.

_____

Submitted September 21, 2020 – Decided March 4, 2021

Before Judges Messano, Hoffman, and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-1135-16.

Castellani Law Firm, LLC, attorneys for appellant (David R. Castellani, on the brief).

Michael A. Armstrong & Associates, LLC, attorneys for respondent City of Atlantic City (Morrison Kent Fairbairn, on the brief).

Riley & Riley, attorneys for respondents Anthony Cox and Dale Finch (Michael E. Riley, on the brief).

PER CURIAM

Plaintiff Rick Russo appeals from the April 12, 2019 Law Division order granting the summary judgment dismissal of his complaint against defendants, City of Atlantic City (the City), Anthony Cox, and Dale Finch. Plaintiff contends the motion judge improperly found his claims barred by collateral estoppel, the CEPA waiver provision, and the statute of limitations, and otherwise lacked merit. We affirm.

I.

We discern the following facts from the record. Since 1994, the City employed plaintiff in its Licensing and Inspection Department. The events that gave rise to this lawsuit began in 2011; at the time, plaintiff worked in a civil service position as a Supervising Field Representative. He reported to Gary Alston, then the Chief Field Representative, who reported to Anthony Cox, then the Director of Licensing and Inspection.

A.

In November 2011, Cox "wrote up" plaintiff for failing to report to his superiors that a scheduled overtime inspection of a property was not performed by Fred Sutton, an inspector supervised by plaintiff. On the Friday afternoon before the scheduled inspection, Sutton advised plaintiff he did not feel well and

could not perform the inspection. Plaintiff was going on a camping trip later that day and left without notifying Cox that he could not find anyone to perform the scheduled inspection. On October 14, 2011, Cox held recorded meetings with plaintiff, Sutton, and Alston to discuss the missed inspection with each of them individually. During his meeting, plaintiff asked Cox if they had to get "every little thing" approved by him. Cox responded that plaintiff deprived Cox of the opportunity to ensure that the inspection was completed on the scheduled date. Plaintiff ultimately admitted at the meeting, "Okay, I'm wrong." In November, Cox recommended "major" disciplinary action, a suspension of six or more days. Plaintiff did not learn of the proposed disciplinary action until months later, on April 16, 2012, when he received notice of the action.

Meanwhile, on March 1, 2012, an incident involving the property at 1600 Arctic Avenue (the Arctic Ave. property) occurred. At the time, plaintiff supervised John Stinsman, who issued a notice of violation and order to abate to the owner of the Arctic Ave. property. The building was vacant and partially boarded-up; in accordance with regular procedure, the notice ordered the property be "repair[ed] or demolish[ed]." Significant to this case, Cox was a member of the LLC that owned the Arctic Ave. property. Plaintiff claimed he did not know this fact – nor did he have any reason to know it – when he

approved issuance of the notice. However, plaintiff did not sign the notice; instead, he explained that he used Alston's signature stamp because, at the time, Alston was on medical leave.

According to Cox, after the notice issued, his business partner forwarded it to him. Recognizing the conflict of interest raised by his department inspecting a property in which he maintained an ownership interest, Cox "immediately" forwarded the notice to the City's Business Administrator. Shortly thereafter, the Business Administrator, "just as [he had] done in other cases," voided Stinsman's inspection due to the conflict, and contacted another municipality to complete the inspection.

Cox testified that he did not know plaintiff was involved in the Arctic Ave. property inspection as the notice does not bear plaintiff's name since he used Alston's signature stamp. Cox further testified that he did not know Alston was on medical leave when the notice was issued. When asked at his deposition why he did not know Alston was on medical leave, Cox responded, "[w]hat I did know was that I had four or five other divisions that I'm responsible for and that a document shows up with [Alston's] name stamped and an inspector. That's what I knew. That's all I knew."

4

The Business Administrator issued an internal memo, dated March 30, 2012, advising Alston of the conflict concerning the Arctic Ave. property. Plaintiff claimed he learned of Cox's ownership interest in the Arctic property from this memo. Approximately two weeks later, on April 16, 2012, plaintiff was served with the Notice of Disciplinary Action for his November 2011 absence.

In July 2012, plaintiff's disciplinary hearing was held. On August 20, 2012, the Hearing Officer found that plaintiff failed to notify his supervisors of the inspection (an undisputed fact) and concluded that plaintiff was "guilty of conduct unbecoming a public employee." Rather than impose major discipline, however, the Hearing Officer imposed a one-day suspension.

Also in August 2012, plaintiff disagreed with Cox over an issue with a property located at 117 South Martin Luther King Boulevard (the MLK Blvd. property). An inspector under plaintiff's supervision previously cited the property for insufficient electrical service. Plaintiff explained,

> Every dwelling unit is required to have a 60[-]amp service, a minimal 60[-]amp service per unit, as per the International Property Maintenance Code, Chapter 60[.] Upon inspection of the building, it was determined that the units only had a 40[-]amp service to each unit, so the inspector cited the owner to upgrade all units to a 60[-]amp service.

A-4024-18

Plaintiff further noted, "it's a very big violation . . . because [fixing the problem required] such a massive upgrade to the [fifty-two-unit high rise] building," built in 1929.

According to plaintiff, the owner of the MLK Blvd. property "petitioned Cox to have a meeting to apply for an exemption so he wouldn't be required to upgrade the electric." Plaintiff attended the meeting, held on August 2, 2012. The property owner submitted documents showing the units were only drawing twenty-seven amps per hour and, therefore, the forty-amp service was sufficient.

Cox granted the exemption at the meeting. According to plaintiff, "Cox did not ask [plaintiff] or [the inspector who issued the citations] to speak on the matter. He just said granted and that was the end of it."

Plaintiff, concerned that the exemption was inconsistent with the International Property Maintenance Code (IPMC), wrote a memo to Alston, who did not attend the meeting. At his deposition, plaintiff recounted,

> A: I wrote a memo to Garry Alston questioning the exemption that was granted and the manner in which it was granted. The International Property Code has an administrative chapter that explicitly details the steps needed to grant an exemption and none of the steps were taken in the granting of this exemption, including the recording of the decision.
>
> Q: Now did Mr. Alston respond to your memo?

6

A-4024-18

A: I believe he did.

Q: How did he do that?

A: He asked me to investigate it.

. . . .

Q: And when did he ask you to investigate it?

A: Shortly after he received my memo.

Q: . . . [W]hat steps did he expect you or want you to take to investigate it?

A: Well, he thought it might be a good idea to contact the International Property Maintenance Council (the ICC), of which I am a member of the committee[.] I'm the contact for the City for the [IPMC] . . . . [S]o I sent a letter to . . . the [IPMC] Council . . . and asked . . . a hypothetical situation that was relevant to the [MLK Blvd. property], whether or not an exemption should be granted based upon the information that I had gathered in reference to that meeting.

Plaintiff, at Alston's direction, contacted the ICC for an opinion on whether the exemption complied with the IPMC. On September 12, 2012, the ICC responded in writing to plaintiff. The letter opined that an exemption should not be granted for "a 10 story 50[-]unit multi-family building built in 1929 [that] was cited for not having an electrical service rating of not less than 60 amperes." However, the ICC qualified its opinion by stating that it was based

7

solely on the information plaintiff provided and did not include local, state, or federal codes, policies, or amendments.

On September 27, 2012, plaintiff forwarded the letter he received from the ICC to Alston, who then forwarded plaintiff's memo and the ICC letter to Cox. Notwithstanding this letter, Cox maintained his opinion that the IPMC did not apply to the MLK Blvd. electrical service issue. Before arriving at his final decision, Cox consulted with State Inspector George Eaton,[1] Design Architect Craig Dothe, Electrical Sub-Code Official Steve Keiner, and Deputy City Solicitor Irv Jacoby.

In November 2012, Alston announced his retirement, effective at the end of the month, and recommended to Cox that plaintiff fill his position. Upon Alston's retirement in December 2012, plaintiff began performing Alston's duties and Cox promoted him to the position of Acting Chief Field Representative, with additional compensation. However, plaintiff contended he should have been appointed to Alston's position – with a pay increase – rather than serving "out-of-title" in an "acting" capacity.

---

[1] A Supervisor with the Bureau of Housing Inspections in the Department of Community Affairs, Eaton sent Cox an email, advising that he "checked on the status of [the MLK Blvd.] property and it shows everything is in compliance[.]" He further advised that "we do not follow or enforce any other code but our own so we do not make any building conform to the [IPMC][.]"

On January 29, 2013, plaintiff submitted a grievance concerning Cox's failure to permanently appoint him to Alston's position. Shortly thereafter, he also requested the Civil Service Commission (Commission) to perform a "desk audit"[2] concerning the same issue.

In March 2013, Cox removed plaintiff as Acting Chief, returning him to the position he held before Alston's retirement, and posted a formal vacancy announcement for Alston's position. Plaintiff described the way Cox removed him as "very disrespectful." Cox informed plaintiff of his removal on a Thursday, when he had a four-day vacation planned to start the following Monday. Plaintiff testified that he expected to empty his desk and move offices when he returned; instead, upon his return, he discovered that someone had "go[ne] into my locked office, empt[ied] out my drawers that were all locked, dump[ed] all of my personal stuff . . . in a big pile so that when I came back, I was basically humiliated, because all the other inspectors saw that and they thought geez." Plaintiff subsequently submitted another grievance over his removal from the Acting Chief position.

---

[2] Under N.J.A.C. 4A:3-3.9(a), an employee who believes that his or her "duties . . . do not conform to the approved job specification for the title assigned to that position" may request a review of his or her job classification. This review is commonly referred to as a "desk audit."

Plaintiff, along with three other people, formally applied for the permanent position of Chief Field Representative. Cox interviewed plaintiff and Kathleen Dierwechter, who tied with plaintiff for the number-one ranking on the civil service list, for the position. Cox ultimately hired Dierwechter. Plaintiff contends that Dierwechter was less qualified for the position because she, unlike plaintiff, had no supervisory experience, and held fewer licenses.

B.

On June 25, 2013, plaintiff filed a complaint against the City and Cox in federal court in the District of New Jersey. See Russo v. City of Atl. City, No. 13-3911, 2016 U.S. Dist. LEXIS 50056 (D.N.J. April 14, 2016). Plaintiff asserted violations of 1) the First Amendment, pursuant to 42 U.S.C. 1983, and 2) the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. On April 14, 2016, Judge Renee Bumb granted defendants' summary judgment motion as to plaintiff's federal claim and permitted the parties to show cause as to exercising supplemental jurisdiction over plaintiff's CEPA claim. Judge Bumb ultimately declined to exercise supplemental jurisdiction over the CEPA claim and issued an order dismissing the CEPA claim, without prejudice, on April 27, 2016.

Meanwhile, on July 22, 2015, plaintiff reported to a continuing education class, considered "official business," instead of work. Upon arrival, plaintiff and three other employees learned they were not registered for the class and went home.

The following day, Finch[3] – who had replaced Cox as Director of Licensing and Inspection in 2014 – discovered that plaintiff and the other employees did not return to work or contact their supervisors about the lack of registration for the class; notably, plaintiff was the only supervisory employee in the group. Accordingly, Finch considered the employees' actions a "no call, no show" and did not pay them for that day. After the employees filed grievances disputing the discipline, Finch filed formal disciplinary charges against them, seeking a thirty-day suspension of plaintiff and a ten-day suspension of the other employees. Finch also removed plaintiff from the "no heat" calls list, which serves to provide employees with an opportunity to earn

---

[3] In November 2013, a change in the City's administration resulted in Cox returning to his previous position of Building Sub-Code Official; at that point, he no longer retained any supervisory power over plaintiff. Following his appointment, Finch restructured the department and discontinued the position of Chief of Code Enforcement. In addition, plaintiff, as Supervising Field Inspector, began supervising the Property Maintenance Department. In the new role, plaintiff supervised a crew of inspectors who wrote notices of violation for the exterior of properties throughout the City.

additional pay; in addition, employees on the list received fifty dollars per week along with a city issued cell phone. The disciplinary charges were ultimately dropped against the other employees, but not plaintiff.

On May 25, 2016, plaintiff filed a complaint against the City, Cox, and Finch in the Law Division. He alleged violations of 1) CEPA and 2) the New Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-1 to -2. On April 12, 2019, the trial court granted defendants' motion for summary judgment.

The judge dismissed the CRA claim, finding it barred by the CEPA waiver provision. The judge reasoned the CRA claim was not substantially independent of the CEPA claim because the CRA claim integrated the CEPA claim "as specifically provided in paragraph 21 of [the CRA] complaint[.]"

The judge also addressed the res judicata and collateral estoppel defenses, finding the federal court engaged in an analysis of the "identical" issues before the court. Moreover, the judge found the CEPA claim barred by the statute of limitations. Plaintiff filed his complaint in state court on March 25, 2016, and although a "30-day tolling applied once the Federal Court declines to exercise supplemental jurisdiction[,]" the judge found the federal court declined supplemental jurisdiction on April 14, when summary judgment was granted against plaintiff.

Notwithstanding these procedural hurdles, the judge addressed plaintiff's CEPA claim on the merits. Although finding that plaintiff established the first two prongs necessary for a viable CEPA claim, the judge concluded that plaintiff failed to establish the third prong, that he experienced an adverse employment action. The judge therefore granted defendants' summary judgment motion, finding "nothing in the record that raises a genuine issue as to any material fact as it relates to the MLK [Blvd.] property, the Arctic Avenue property, or . . . any perceived retaliation, which this [c]ourt finds did not exist."

This appeal followed.

## II.

As a preliminary matter, we agree with plaintiff's contention that the motion judge erred when he concluded that the thirty-day statute of limitations applied to bar plaintiff's claims. See Artis v. Dist. of Columbia, 138 S. Ct. 594, 598 (2018). Although Judge Bumb granted the summary judgment dismissal of plaintiff's federal claim on August 14, 2016, she invited further consideration of his CEPA claim and did not dismiss that claim until April 27, 2017. Plaintiff timely filed the matter under review on May 25, 2017, within thirty days of the April 27 dismissal order. Apart from that issue, we conclude the motion judge

correctly determined that plaintiff's claims are barred the CEPA waiver provision and by collateral estoppel, and otherwise lack merit.

Under CEPA's waiver provision, "the institution of an action in accordance with [CEPA] shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19-8. The provision "applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA. The waiver exception does not apply to those causes of action that are substantially independent of the CEPA claim." Young v. Schering Corp., 141 N.J. 16, 29 (1995). "Parallel claims based on those rights, privileges[,] and remedies are waived because they represent multiple or duplicative claims based on retaliatory discharge." Ibid.

Here, plaintiff relies on the same facts for his CRA and CEPA claims; both claims allege retaliation for plaintiff's claimed whistleblowing activity regarding the Arctic Ave. and MLK Blvd. properties. Adding Finch as a defendant does not make the CRA claim sufficiently distinguishable. Plaintiff simply argues Finch disciplined him because of Finch's alleged "political associat[ion]" with Cox and in retaliation for asserting his right "to file and

14

pursue grievances[.]"  Ultimately, plaintiff failed to present a claim independent of the CEPA claim.

"Collateral estoppel . . . bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action."  Div. of Youth & Fam. Servs. v. R.D., 207 N.J. 88, 114 (2011) (quoting State v. Gonzalez, 75 N.J. 181, 186 (1977)).  In Gannon v. Am. Home Prod., 211 N.J. 454, 469 (2012), our Supreme Court resolved "the question about the proper analytical framework for testing the collateral estoppel effect of federal judgments," making it clear "the issue is governed by reference to federal rather than to state law principles."

The Third Circuit held that, for a judgment to be given the effect of collateral estoppel, there must be a coalescence of the following four factors:

> (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question.
>
> [Id. at 471-72 (quoting Del. River Port Auth. v. FOP, Penn-Jersey Lodge 30, 290 F.3d 567, 574 n.10 (3d Cir. 2002)).]

A party establishes an issue is identical by demonstrating "that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules."  Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000) (quoting Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4425 at 253 (1981)).  The existence of an additional element in a federal cause of action as opposed to the analogous state law cause of action "does not alter" the fact that the issues are identical.  Hailey v. City of Camden, 650 F. Supp. 2d 349, 356 (D.N.J. 2009) (holding that proving a hostile work environment under 42 U.S.C. 1983 is identical to the analogous cause of action under the CRA).  "To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be substantial."  Id. at 354 (citation omitted).

Here, a common set of facts gave rise to both plaintiff's First Amendment and CEPA claims.  Although Judge Bumb specifically declined to consider the pendent state law claims, she nevertheless analyzed whether plaintiff experienced retaliation for engaging in protected speech.

First, plaintiff's CEPA claims against Cox arising from the Arctic Ave. property are precluded by the federal court decision.  When analyzing plaintiff's First Amendment claim, Judge Bumb found "the record evidence fails to support

16

a finding that Cox retaliated against [plaintiff] for approving the citation of [the Arctic Ave. property]." Russo, 2016 U.S. Dist. LEXIS 50056, at 23. Under CEPA, plaintiff asserts this identical claim. Moreover, plaintiff failed to present any additional evidence on the matter for his related CEPA claims. The essential issue of plaintiff's CEPA claim arising from the Arctic Ave. property citation was already litigated and is precluded by collateral estoppel.

Similarly, plaintiff's CEPA claim arising from his filed grievances are also precluded by the federal court decision. CEPA protects only whistleblowing activity, and plaintiff alleges his rights were violated under CEPA because he experienced retaliation, in part, for filing grievances. Estate of Roach v. TRW, Inc., 164 N.J. 598, 609-10 (2000). Although Judge Bumb did not specifically address whether plaintiff's grievances were CEPA whistleblowing, she did address the exact same issue – whether Cox retaliated against him for filing grievances – under the First Amendment. Accordingly, the judge held that his grievances "did not involve a matter of public concern." Russo, 2016 U.S. Dist. LEXIS 50056, at 18.

CEPA does not protect wholly private grievances. See Maw v. Advanced Clinical Comm., Inc., 179 N.J. 439, 445 (N.J. 2004) ("[T]he complained of activity must have public ramifications, and that the dispute between employer

and employee must be more than a private disagreement."); Mehlman v. Mobil Oil Corp., 153 N.J. 163, 188 (1998) ("[T]he offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee."); Beasley v. Passaic Cnty., 377 N.J. Super. 585, 607 (App. Div. 2005) (noting that CEPA is not intended to "settle internal disputes at the workplace" (internal quotation omitted)). Thus, we are satisfied the public concern inquiry under the First Amendment is "very similar" to the whistleblowing inquiry under CEPA. Espinosa v. Cnty. of Union, 212 Fed. App'x 146, 153 (3d Cir. 2007). Given this similarity, Judge Bumb's public concern inquiry applies to his CEPA claims as well; the same relevant factual and legal issues relating to plaintiff's grievances were decided and dismissed. Therefore, we conclude that plaintiff's related CEPA claims are precluded by collateral estoppel. Nevertheless, like the motion judge, we will also address the merits.

## III.

We review a grant of summary judgment under the same standard as the trial judge. Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 41 (2012). We must determine whether there are any genuine issues of material fact when the evidence is viewed in the light most favorable to the non-moving party. Id. at

18

38, 41. "The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a [finder of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)) (internal quotation marks omitted). "[T]he legal conclusions undergirding the summary judgment motion itself" are reviewed "on a plenary de novo basis." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 385 (2010).

CEPA prohibits an employer from taking "retaliatory action" against an employee for protected whistleblower conduct. N.J.S.A. 34:19-3. To establish a prima face case under CEPA, a plaintiff must prove four elements: 1) the plaintiff reasonably believed that the employer's conduct violated "either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy"; 2) the plaintiff "performed a 'whistle-blowing' activity"; 3) the plaintiff experienced an adverse employment action; and 4) "a causal connection exists between the whistle-blowing activity and the adverse employment action." Yurick v. State, 184 N.J. 70, 78 (2005) (citation and internal quotation marks omitted).

The motion judge found that plaintiff proved the first two prongs with respect to the ICC opinion letter,[4] but concluded that plaintiff failed to prove he sustained an adverse employment action. Under CEPA, a retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). Here, plaintiff alleges that, in retaliation for the ICC opinion, Cox removed him from the Acting Chief position, failed to promote him to the permanent position, and subjected him to a hostile work environment.

Plaintiff's relies on Maimone v. City of Atl. City, where our Supreme Court found that a superior transferring an employee and causing a reduction in compensation was an adverse employment action. 188 N.J. 221, 236 (2006); however, Maimone is distinguishable. Although removing plaintiff from the Acting Chief position affected plaintiff's responsibilities and compensation, the record clearly demonstrates that plaintiff's position was temporary. Plaintiff had

---

[4]  The City and Cox do not concede that plaintiff had a reasonable belief that unlawful activity had occurred regarding the MLK Blvd. property or that the exemption Cox approved created a threat to the public. We agree with the City that "[t]he record is replete with evidence to the contrary." We need not review this evidence because the motion judge correctly concluded that the record establishes that plaintiff failed to prove he sustained an adverse employment action as the result of his claimed whistle-blowing activity.

previously served in this temporary position when Alston was on sick leave. As plaintiff himself complains, he performed the duties of this position "out of title" in an "acting" capacity. Because plaintiff was never promoted to this position, he could not be demoted from it. We are satisfied that plaintiff's removal from the Acting Chief position did not constitute an adverse employment action.

Plaintiff's failure-to-promote claim fares no better. To establish a prima facie case of retaliation by failure to promote, a plaintiff must prove "by the preponderance of the evidence that . . . [his] engagement in the protected activity was a cause of the promotion denial." Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 447 (App. Div. 1990) (citation omitted).

The record shows that plaintiff sent the ICC opinion letter to Alston in September 2012. Nevertheless, in December, Cox placed plaintiff in the Acting Chief position. The New Jersey Civil Service, an independent governmental unit, found plaintiff and Dierwechter equally qualified for the position. While Alston recommended to Cox that plaintiff fill his position, Cox testified that he did not follow Alston's recommendation because he felt Alston and plaintiff "were defiant to [his] authority as director since" his appointment in 2009, by "show[ing] up for hearings unprepared" or not showing up at all. Both Dierwechter and plaintiff were interviewed, and Dierwechter was ultimately

hired in March 2013. Since the employee selected for the Chief Field Representative position was determined by the Civil Service Commission to be equally qualified for the position, plaintiff's claim that he was passed over by someone unqualified for this position clearly lacks merit and provides no circumstantial evidence of retaliation.

Lastly, plaintiff failed to establish a hostile work environment. "[I]n order to be actionable, an allegedly retaliatory act [of hostile work environment] must be 'sufficiently severe or pervasive to have altered plaintiff's conditions of employment in an important and material manner.'" El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 176 (App. Div. 2005) (quoting Cokus v. Bristol-Myers Squibb Co., 362 N.J. Super. 245, 246 (App. Div. 2003)).

Plaintiff presented no evidence from which a reasonable factfinder could find that he was subjected to acts so severe or pervasive that they altered the conditions of employment in a significantly adverse manner. Plaintiff complains of being locked out of his former office after being removed from the Acting Chief position and having his belongings moved, and being taken off "no heat" calls list and losing the related phone allowance. However, such conduct

does not rise to the level of an adverse employment action[5] under CEPA. See Beasley, 377 N.J. Super. at 607 (noting that conduct that results in a "bruised ego or injured pride" is not an actionable under CEPA).

Therefore, we are satisfied the trial court correctly found plaintiff's CEPA claims failed as a matter of law because plaintiff failed to establish that he suffered any adverse employment action cognizable under CEPA. Plaintiff's remaining claims were properly procedurally barred by collateral estoppel and the CEPA waiver provision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] We find significant that plaintiff never received a discharge, suspension or demotion. Rather, his theory of adverse employment action is first predicated on the fact that defendants Cox and Finch both instituted disciplinary actions against him, ignoring the fact there was a substantial basis for both actions. However, "filing a CEPA claim 'does not insulate the complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint.'" Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 360-61 (App. Div. 2002) (quoting Higgins v. Pascack Valley Hosp., 158 N.J. 404, 424 (1999)). The fact the charges were ultimately substantiated precludes plaintiff from asserting that the disciplinary actions constituted wrongful acts of retaliation. See Hancock, 347 N.J. Super. at 361.

23